**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**NANCY KING, and**                                    **CASE NO.:**
**THE OCCUPATIONAL**
**HEALTH CENTER, INC.,**

      **Plaintiffs,**

**vs.**

**BOARD OF COUNTY COMMISSIONERS,**
**POLK COUNTY, FLORIDA;**
**KANDIS BAKER-BUFORD, individually;**
**LEA ANN THOMAS, individually; and**
**JIM FREEMAN, individually,**

      **Defendants.**

_____/

## COMPLAINT

Plaintiffs, NANCY KING, and THE OCCUPATIONAL HEALTH CENTER, INC., hereby sue Defendants, BOARD OF COUNTY COMMISSIONERS, POLK COUNTY, FLORIDA; KANDIS BAKER-BUFORD, individually; LEA ANN THOMAS, individually; and JIM FREEMAN, individually, and allege:

### JURISDICTION

1.　　This is an action for damages, injunctive and equitable relief, costs, and attorney's fees, brought under the First Amendment to the United States Constitution, through 42 U.S.C. §1983, and under Florida's Public Whistleblower Act, §112.3187, Fla. Stats.

2.　　Jurisdiction of this court is also invoked pursuant 28 U.S.C. §1331 (federal

question jurisdiction), 28 U.S.C. §1343 (civil rights claim jurisdiction), and 28 U.S.C. §1367 (supplemental jurisdiction). This is an action involving claims which are, individually, in excess of Seventy Five Thousand Dollars ($75,000.00), exclusive of costs and interest.

## CONDITIONS PRECEDENT

3.      Plaintiff has satisfied all conditions precedent to filing this action, if any.

## THE PARTIES

4.      At all times pertinent hereto, Plaintiff, NANCY KING, has been a resident of the State of Florida. She was contacted with Defendant BOARD OF COUNTY COMMISSIONERS, POLK COUNTY, FLORIDA, at all times pertinent hereto, and is *sui juris*.

5.      At all times pertinent hereto Plaintiff THE OCCUPATIONAL HEALTH CENTER, INC., has been authorized and existing under the laws of Florida.

6.      At all times pertinent hereto, Defendant, BOARD OF COUNTY COMMISSIONERS, POLK COUNTY, FLORIDA ("COUNTY"), has been authorized and existing under the laws of Florida, and has been subject to Chapter 112, Florida Statutes.

7.      At all times pertinent hereto, Defendant, KANDIS BAKER-BUFORD, has been employed by Defendant COUNTY, has taken action in violation of the First Amendment to the United States Constitution within the jurisdictional boundaries of this court, and is *sui juris*. She is sued in her individual capacity.

8.      At all times pertinent hereto, Defendant, LEA ANN THOMAS, has been employed by Defendant COUNTY, has taken action in violation of the First Amendment to the United States Constitution within the jurisdictional boundaries of this court, and is *sui juris*. She is sued in her individual capacity.

9.      At all times pertinent hereto, Defendant, JIM FREEMAN, has been employed by Defendant COUNTY, has taken action in violation of the First Amendment to the United States Constitution within the jurisdictional boundaries of this court, and is *sui juris*. He is sued in his individual capacity.

## STATEMENT OF THE ULTIMATE FACTS

10.      Plaintiff Nancy King, a physician who is white, started working as Occupational Medicine Medical Director for Polk County in October, 2000. Defendant renewed her three-year contract five consecutive times for fifteen (15) years without ever using the statutory request for proposal (RFP) process.

11.      Plaintiff oversaw the administration of physicals, drug testing, and worker's compensation claims for the Defendant County during her time as the Medical Director. This included performing all the fitness-for-duty evaluations that the County required.

12.      On December 26, 2013, Plaintiff's Physician Assistant Kelly Manion performed a post offer physical examination on an African American male ("Mr. J") whom the County had recruited to be a firefighter. Manion determined that Mr. J was medically disqualified.  At the time, there was an effort by the County to recruit and hire African American employees into certain positions within the County which may have included firefighters.

13.      In November 2014, Plaintiff learned that Mr. J had been in the firefighter training program and on the County's payroll since his medical examination or shortly thereafter, despite being medically disqualified. Plaintiff was asked to review Mr. J's medical records and make a fitness-for-duty determination. Plaintiff said she would have to see Mr. J personally in her office because he had not been examined since December 2013.

3

14.     A few days later, Director of Risk Management, Michael Kushner, requested that Plaintiff inform Kandis Baker-Buford that she was examining Mr. J.

15.     Kandis Baker-Buford, an African-American female, is the Human Resources Director for Polk County, as well as the Diversity Director, and the Director of the Polk County EEOC office.

16.     On November 14, 2014, Baker-Buford told Plaintiff that it would be inappropriate for her to see Mr. J because he had already been cleared by his treating physician, Dr. Ackerman. Plaintiff told her that she had been asked to give a determination and that she had to see Mr. J. to do so. Baker-Buford repeated that Plaintiff could not see Mr. J and she would handle the issue with Kushner.

17.     Plaintiff called Kushner and advised him of the conversation she had just had with Baker-Buford.

18.     On December 1, 2014, Plaintiff received an email from Kushner outlining a conversation with Baker-Buford and requesting that Plaintiff review Mr. J's medical records to determine whether or not they contained falsified medical information. In her effort to comply with this request, Plaintiff requested medical records from the Employee Health Services clinic. During her review it was noted that some of the medical records from Mr. J's treating physicians had been provided to the Employee Health Clinic directly by Baker-Buford in a completely unprecedented manner as opposed to Mr. J submitting medical records directly to the Employee Health Services clinic as he had been instructed to do.

19.     On December 10, 2014, Plaintiff emailed Kushner and advised him that she had completed the records review, but given the contentious nature of the case she was

4

recommending a second opinion from a specialist. Plaintiff told Kushner that she could not

qualify Mr. J for duty, and that Baker-Buford had repeatedly told her that she could not examine

him.

20.     Diane Mulloney, the County's Employee Health Manager, then emailed Baker-

Buford and told her that an appointment had been made with specialist Dr. James McCluskey for

January 27, 2015. Baker-Buford responded that Mr. J was not available because of a class

conflict and he would have to reschedule. The appointment was rescheduled to February 6, 2015.

21.     On January 21, 2015, Plaintiff was copied on an email between Mulloney and

Baker-Buford. Baker-Buford was demanding to know Dr. McCluskey's credentials. Mulloney

sent Baker-Buford Dr. McCluskey's curriculum vitae, as well as documentation from Dr.

Ackerman that Mr. J was to be re-evaluated if he experienced symptoms while exerting himself.

22.     On February 5, 2015, Dr. McCluskey received a call from an unknown female

who represented herself to be Mr. J's attorney. She informed Dr. McCluskey that "my client"

would not be going to his appointment the following day. Plaintiff had no idea that Mr. J was

represented by counsel. Plaintiff made a public records request which showed that the call had

actually come from Sharon Mathis' phone in Baker-Buford's department.

23.     On March 2, 2015, Kushner emailed Baker-Buford and advised her that Plaintiff

had sole discretion in making medical determinations on behalf of the County. Baker-Buford

insisted that plaintiff should have provided a panel of three physicians for Mr. J to choose from if

she wanted a second opinion, however, this would have represented a deviation from normal

clinic protocols.

24.     In early March 2015, Plaintiff tried to make an appointment to meet with County

Manager Jim Freeman to discuss her public safety concerns and Baker-Buford's bizarre and aggressive involvement with Mr. J. Plaintiff was not given the opportunity to talk to him and was referred to Deputy County Manager Lea Ann Thomas. The meeting was scheduled for March 12, but Thomas cancelled.

25.     On March 12, 2015, Plaintiff faxed a letter to Dr. Ackerman outlining her position with the Board of County Commissioners and all of her concerns regarding Mr. J. Included in the letter were the medical guidelines for physicians evaluating firefighters.  In her letter, she discussed the violation of the NFPA 1582 standards regarding Mr. J and allowing him to work for the Defendant County despite the fact that he was not medically qualified to do so.

26.     Dr. Ackerman thereafter called Plaintiff because he was angry about the number of calls and letters he was getting regarding the County and Mr. J.

27.     Dr. Ackerman admitted that he had been unaware of the guidelines, and when he reviewed them, he immediately agreed that Mr. J was not medically qualified to be a firefighter based upon the NFPA guidelines.

28.     On March 12, 2015 Plaintiff emailed Baker-Buford and told her about her conversation with Dr. Ackerman. Plaintiff also advised Baker-Buford that she would be Dr. Ackerman's sole point of contact regarding Mr. J and that any releases etc. would be received and distributed only by her as appropriate.

29.     On March, 13, 2015, Plaintiff sent a certified letter to Mr. J apprising him of her conversation with Dr. Ackerman and advising him that it was her medical determination that he was not qualified to perform the essential functions of a firefighter.

30.     On March 16, 2015, Plaintiff received an email from Baker-Buford warning her

that she needed to "treat all employees the same." Attached to the email was a letter from Dr. Ackerman clearing Mr. J for duty, dated March 10, 2015, two days before Dr. Ackerman was made aware of the medical guidelines and his conversation with Plaintiff.

31.     After a second cancelled appointment, Plaintiff was finally able to speak to Lea Ann Thomas on March 31, 2015. She outlined her concerns and provided Thomas with documentation to substantiate the multiple oddities with Mr. J and Baker-Buford's unprecedented involvement in his medical clearance.

32.     On April 1, 2015, Plaintiff sent Dr. Ackerman a State Fire Marshall Medical Clearance document for him to sign. He signed and returned it two days later, noting that Mr. J was not medically qualified for firefighter training. Plaintiff gave a copy of this letter to Lea Ann Thomas.

33.     On April 6, 2015, Mr. J was dismissed from firefighter training as he had been deemed medically unfit by Dr. Ackerman.

34.     Determined to retain Mr. J, shortly thereafter, Fire Chief David Cash emailed Plaintiff on April 21, 2015, asking her whether she felt Mr. J could work as an Emergency Medical Technician (EMT) without firefighting responsibilities. Plaintiff recommended an outside Occupational Medicine Physician perform the evaluation because of the contentious nature of the case.

35.     The EMT fitness for duty exam was completed by Dr. Gupta on June 9, 2015. However, Dr. Gupta said that he would require additional tests before he could make a determination about Mr. J's fitness for duty. Plaintiff provided this information to Kushner on June 25, 2015.

36.      Plaintiff subsequently received a call from Deputy County Manager Gary Hester.  Hester told Plaintiff that the County would not agree to the extra tests that Dr. Gupta asked for and would not require nor ask Mr. J to complete those medical recommendations. Hester said Plaintiff was imposing requirements on Mr. J that she had never imposed on any other applicant. Plaintiff tried to explain that Mr. J's condition may have changed in the 18 months since his last physical agility test. She also reminded him that each and every fitness-for-duty examination is given individual consideration. Hester became belligerent and raised his voice at Plaintiff.

37.      On September 11, 2015, Plaintiff was finally able to meet with County Manager Jim Freeman. She told Freeman about everything that had been going on. Plaintiff told Freeman that her priority was the safety of Mr. J, his coworkers, and the public and that there were public safety concerns with Mr. J working as a firefighter and EMT.  It was not part of Plaintiff's ordinary job duties to meet with Freeman nor to disclose the public safety issues that she discussed with him at that time.  Freeman responded "We just needed your help on this, Dr. King." Plaintiff responded that her responsibility to the County is to make sure that personnel were medically fit for duty, and that she would not compromise her medical judgment for anyone. Freeman said he understood and did not expect Plaintiff to compromise herself.

38.      Plaintiff then informed Freeman that she would be a poor witness for the County if there was a catastrophic event because of Mr. J's condition. The meeting ended cordially and Plaintiff thanked Freeman for allowing her to speak with him.

39.      Around mid September, 2015, Plaintiff was advised by Kushner that the County was putting the Occupational Medicine Medical Director contract (her contract) out for bid

through a request for proposal (RFP) for the first time in over 15 years. Kushner was surprised

that the county was requesting an RFP because it was his understanding that there was no

statutory requirement for same.  Plaintiff's contract was due to expire on September 30, 2015 but

Kushner requested Plaintiff agree to a four month extension to fill the gap. Plaintiff agreed but

no written contract was ever executed between Plaintiff and the Board of County

Commissioners.

      40.     Pursuant to the RFP, on December 16, 2015, Plaintiff submitted her proposal to

the County's Procurement Office. Only Plaintiff and the University of South Florida (USF)

submitted proposals to the County.

      41.     The Selection Committee was made up of five members including Lea Ann

Thomas. No county commissioners were appointed to serve on the  Selection Committee as

required in the county's Purchasing Procedures Manual dated 8/6/2010, page 48. The Selection

Committee scored the proposals on February 4, 2016, and decided it wanted to interview the

applicants for the RFP.

      42.     On February 10, 2016 Plaintiff was interviewed by the Selection Committee

regarding her proposal. Incredibly, Thomas asked her "Based upon recent difference of

expectations with the county manager's office and that whole situation of care what would you

do differently or how would you handle that if we were starting in the beginning?"

      43.     Plaintiff responded that she had requested to speak with the county's labor

attorney on three different occasions and was denied each time.  Plaintiff further  stated that

should the county select her organization  she would insist on access to a labor attorney if she

deemed necessary in the future. There was no admission of any wrongdoing. The other members

of the committee had no idea what Thomas meant and when Plaintiff asked if Lea Ann Thomas would like for her to get into the "particulars", Thomas replied "No, that would take too long." The question was not related to the proposal and could not have been asked of Plaintiff's competitor for the contract.

44.     The County procurement office issued a document on February 15, 2015 stating that the selection committee collectively decided not to make a recommendation to the Board despite the fact that Plaintiff had scored considerably higher than USF as well as outranking them.

45.     On March 1, 2016, Plaintiff sent an email to Diane Mulloney and Jim Freeman notifying them that she would be ending the current verbal contract on March 31, and would be willing to resume service on April 1, 2016 under the terms of her proposal, with a written contract. Plaintiff never received any response or acknowledgment from the County regarding this matter.

46.     On March 24, 2016 the Procurement Director formally rejected all proposals for the Occupational Health Program, RFP# 15-711.

47.     On April 22, 2016, Plaintiff met with Polk County Commissioner Ed Smith to talk about the events set forth above and he told Plaintiff that the RFP had been issued because "several people were embarrassed". He told Plaintiff that the County believed USF would "dominate" Plaintiff, get the contract, and that Plaintiff would "just fade away".

48.     Smith told Plaintiff that she "should get a bottle of whiskey, go home, and let it go." Plaintiff protested that Baker-Buford had violated the essence of her job responsibilities. Smith responded that "had some of those folks been the same ethnicity as you or I, they would

have been fired." He told Plaintiff that Baker-Buford had gotten Jim Freeman out of trouble in the past and that she was "untouchable".

49.     Later that same day Plaintiff met with Dr. McMicken who had been on the Selection Committee. He started the conversation by saying he heard that Plaintiff no longer wanted to work with the county. Plaintiff told him that was not accurate.

50.     Dr. McMicken said that there was a consensus of the committee that the County should enter into contract negotiations with Plaintiff, and USF should be embarrassed of their proposal. He stated that he had even offered to assist the County with contract negotiations with the Plaintiff.

51.     Plaintiff showed Dr. McMicken the email she received stating that the committee had agreed not to make a recommendation to the Board of County Commissioners. Dr. McMicken responded that it was not accurate or correct at all. He further said that all five members of the committee had agreed that they should give the contract to Plaintiff.

52.     On April 26, 2016, Plaintiff met with county employee Bob Page who was also on the selection committee. He confirmed to Plaintiff that the committee had voted to give the contract to her. He informed Plaintiff that the meeting minutes she provided to him and that had been prepared by the County were incorrect.

53.     The County was completely unprepared to continue without a Medical Director and rejected all proposals simply to get rid of Plaintiff.  Since March 24, 2016, the County has not had a contract with anyone for Occupational Health Services. The County has been using local providers.  The County was well aware or should have been aware that they were not legally required to issue an RFP for the contract pursuant to §287.057, Florida Statutes, that

exempts health services from the competitive-solicitation requirement. Written correspondence between Lea Ann Thomas and "Sandi" dated May 19, 2016 documents a request to amend an existing ordinance to make sure the County would not have to go through the process again now that Plaintiff was no longer involved.

54.     The County used the RFP process to wrongfully terminate Plaintiff because she had refused to provide medical clearance which would have permitted Kandis Baker-Buford to continue to hire and have the County employ an unqualified applicant, because she discussed and reported safety concerns with county management and because she refused to medically qualify Mr. J, who is African American. The County also wanted Plaintiff to rubberstamp Mr. J's application because he should not have been put on payroll in January 2014, and did not want to expose the County to any liability, which Plaintiff refused to do.

55.     Plaintiff has retained the undersigned to represent her interests in this cause and is obligated to pay a fee for these services.  Defendants should be made to pay said fee under the statutory provisions cited herein and such other grounds as are authorized.

## COUNT I
## VIOLATION OF PUBLIC WHISTLEBLOWER STATUTE
### (Plaintiff King against Defendant COUNTY)

56.     Paragraphs 1-55 above are realleged and incorporated.

57.     This count sets forth a claim against Defendant COUNTY under §112.3187, *et seq*., Fla. Stats.

58.     As stated more specifically in part above, Plaintiff reported and disclosed, verbally and in writing, violations of law, rules or regulations, and/or malfeasance, misfeasance or gross misconduct to persons both inside and outside of her normal chain of command, and to

12

others having the authority to investigate, police, manage and otherwise remedy the violations that she reported.

59.     After reporting these matters and/or participating in investigations, hearings, or other agency inquiries, as related in part above, Plaintiff was the victim of retaliatory actions set forth in part above.

60.     Plaintiff's adverse treatment, including her termination, was a direct adverse result of her reporting violations of laws, rules or regulations, of her reporting malfeasance, misfeasance or gross misconduct, and/or of her participating in investigations, hearings or other inquiries, specified in part above.

61.     The actions of all employees and agents of Defendant COUNTY who affected Plaintiff's relationship with Defendant COUNTY adversely did so at least in part in retaliation against her for her "whistleblowing" activities.

62.     As a direct and proximate result of the actions taken against her by Defendant COUNTY, Plaintiff has suffered injury, including but not limited to past and future wage losses, and other tangible and intangible damages. These damages have occurred in the past, are occurring at present and will likely occur in the future.

## COUNT II
## VIOLATION OF PUBLIC WHISTLEBLOWER STATUTE
### (Plaintiff OHC against Defendant COUNTY)

63.     Paragraphs 1-55 above are realleged and incorporated.

64.     This count sets forth a claim against Defendant COUNTY under §112.3187, *et seq*., Fla. Stats.

65.     As stated more specifically in part above, Plaintiff OHC, through Plaintiff King,

reported and disclosed violations of law, rules or regulations, and/or malfeasance, misfeasance or gross misconduct to persons both inside and outside of her normal chain of command, and to others having the authority to investigate, police, manage and otherwise remedy the violations that she reported.

66.     After reporting these matters and/or participating in investigations, hearings, or other agency inquiries, as related in part above, Plaintiff was the victim of retaliatory actions set forth in part above.

67.     Plaintiff's adverse treatment, including Defendant wrongfully withholding the Occupational Health Services contract, was a direct adverse result of Plaintiff King reporting violations of laws, rules or regulations on behalf of OHC, malfeasance, misfeasance or gross misconduct, and/or of Plaintiff participating in investigations, hearings or other inquiries, specified in part above.

68.     The actions of all employees and agents of Defendant COUNTY who affected Plaintiff's relationship with Defendant COUNTY adversely did so at least in part in retaliation against Plaintiff for Plaintiff's "whistleblowing" activities.

69.     As a direct and proximate result of the actions taken against it by Defendant COUNTY, Plaintiff has suffered injury, including but not limited to past and future wage losses, loss of benefits, and other tangible damages. These damages have occurred in the past, are occurring at present and will likely occur in the future.

## COUNT III
## FIRST AMENDMENT RETALIATION
### (Plaintiff King against the INDIVIDUAL DEFENDANTS)

70.     Paragraphs 1-55 above are realleged and incorporated.

14

71.     This count sets forth a claim against the INDIVIDUAL DEFENDANTS for First Amendment retaliation, and is brought through 42 U.S.C. §1983. This count is pled in the alternative.

72.     The INDIVIDUAL DEFENDANTS operated to violate Plaintiff's rights under the First Amendment. These violations were of the type and character as to which any reasonable person would be aware. Plaintiff's rights to freedoms of speech and expression were violated. Public contractors like Plaintiff have the right to engage in First Amendment activities without the fear of reprisal.

73.     Plaintiff, as set forth in part above, engaged in constitutionally protected activity by speaking on matters of public concern and beyond the scope of her job duties, including but not limited to her participation in inquiries and investigations and speaking out on safety matters that are of public concern to the citizens of Polk County.

74.     After engaging in protected activity as related in part above, Plaintiff was the victim of retaliatory actions as set forth in part above. The INDIVDUAL DEFENDANTS infringed on Plaintiff's constitutionally protected interests under the First Amendment, as set forth in part above. The INDIVIDUAL DEFENDANTS' actions, set forth in part above, were the types of retaliatory conduct that would deter a person of ordinary sensibilities from exercising his or her First Amendment rights. Plaintiff's protected activity was a substantial or motivating factor in the adverse actions taken against her.

75.     The conduct of the INDVIDUAL DEFENDANTS was in callous and willful disregard of Plaintiff's constitutional rights, thereby authorizing an award of punitive damages against them.

76.     The INDIVIDUAL DEFENDANTS are persons under the laws applicable to this action. The INDIVIDUAL DEFENDANTS are liable, jointly and severally with Defendant COUNTY, for their actions, individually and in concert, which violated the civil rights of Plaintiff under the First Amendment.

77.     The INDIVIDUAL DEFENDANTS personally participated in the adverse actions against Plaintiff in violation of her First Amendment rights set forth above.

78.     The INDIVIDUAL DEFENDANTS were the main participants and/or made the decisions to act adversely to Plaintiff in her relationship with Defendant COUNTY after she engaged in protected First Amendment activity.

79.     At all times pertinent hereto, the INDIVIDUAL DEFENDANTS were acting under color of state law, are persons under the applicable law, and they were acting under color of state law while doing so when they made the decisions and/or participated in the adverse actions against Plaintiff.

80.     The INDIVIDUAL DEFENDANTS acted with malice against Plaintiff and/or in reckless disregard of her clearly established rights under the First Amendment.

81.     As a direct and proximate result of the actions of the INDIVDUAL DEFENDANTS, Plaintiff suffered the adverse actions set forth above. She suffered lost wages, benefits, and other tangible damages. Plaintiff has also sustained emotional pain and suffering damages, loss of the capacity for the enjoyment of life, and other intangible damages. These losses have occurred in the past, are occurring at present, and are likely to occur into the future. Plaintiff is entitled to punitive damages against the Individual Defendants under this count, as well as to an award of costs and attorney's fees under 42 U.S.C. §1988.

## COUNT IV
## FIRST AMENDMENT RETALIATION
### (Plaintiff King against Defendant COUNTY)

82.     Paragraphs 1-55 above are realleged and incorporated.

83.     This count sets forth a claim against Defendant COUNTY for First Amendment retaliation, and is brought through 42 U.S.C. §1983. This count is pled in the alternative.

84.     Defendant COUNTY operated to violate Plaintiff's rights under the First Amendment. These violations were of the type and character as to which any reasonable person would be aware. Plaintiff's rights to freedoms of speech and expression were violated. Public employees/contractors like Plaintiff have the right to engage in First Amendment activities without the fear of reprisal.

85.     Plaintiff, as set forth in part above, engaged in constitutionally protected activity by speaking on matters of public concern and beyond the scope of her job duties, including but not limited to her participation in inquiries and investigations and speaking out on safety matters that are of public concern to the citizens of Polk County.

86.     After engaging in protected activity as related in part above, Plaintiff was the victim of retaliatory actions as set forth in part above. Defendant COUNTY infringed on Plaintiff's constitutionally protected interests under the First Amendment, as set forth in part above. Defendant COUNTY's actions, set forth in part above, were the types of retaliatory conduct that would deter a person of ordinary sensibilities from exercising his or her First Amendment rights. Plaintiff's protected activity was a substantial or motivating factor in the adverse actions taken against her.

87.     Defendant COUNTY retaliated against Plaintiff for her First Amendment

17

activity as alleged herein by taking adverse actions against her, as set forth in part above.

88.     Defendant COUNTY has deprived Plaintiff of her rights to freedom of speech and expression, protected by the First Amendment.

89.     Defendant COUNTY is a person under the laws applicable to this action. Defendant COUNTY is liable, jointly and severally with the INDIVIDUAL DEFENDANTS, for its actions, individually and in concert, which violated the civil rights of Plaintiff under the First Amendment.

90.     Defendant COUNTY misused its power, possessed by virtue of state law and made possible only because it was clothed with the authority of state law. The violations of Plaintiff's rights, as described above, occurred under color of state law and are actionable under 42 U.S.C. §1983.

91.     Defendant FREEMAN, as Manager, Defendant THOMAS, as Deputy County Manager, and Defendant BAKER-BUFORD as Human Resources Director personally participated in the actions adverse to Plaintiff and/or in the decisions to engage in such actions, in violation of her rights to free speech and expression under the First Amendment.

92.     FREEMAN, THOMAS, and/or BAKER-BUFORD were the final decision makers in the actions taken against Plaintiff complained of herein.

93.     Defendant COUNTY, through FREEMAN, THOMAS, and BAKER-BUFORD, and other employees or agents, also failed to implement adequate hiring, retaining, staffing, training and/or supervisory procedures, as a direct result of which Plaintiff's First Amendment rights were violated.

94.     FREEMAN, THOMAS, and/or BAKER-BUFORD had final policymaking

authority for the Defendant COUNTY, and were responsible for hiring, retaining, staffing, training, and supervising other employees of the Defendant COUNTY and, when necessary, for investigating alleged wrongdoing by its employees. Alternatively, in the event it were determined that FREEMAN, THOMAS, and/or BAKER-BUFORD did not have final policymaking authority for Defendant COUNTY, one or both nonetheless functioned as the final policymaker for Defendant COUNTY in connection with the allegations herein, their decisions and actions having been rubber-stamped at all higher levels of authority.

95.     Defendant COUNTY, after notice of the constitutional violations alleged herein, officially sanctioned the actions and refused to discipline its agents and employees, which refusal established a policy, by a final policymaker, that directly or indirectly resulted in violations of Plaintiff's constitutional rights.

96.     Further, Defendant COUNTY ratified the actions of its employees, including the actions of Defendants FREEMAN, THOMAS, and BAKER-BUFORD, who acted adversely to Plaintiff for the exercise of her First Amendment rights.

97.     When Defendant COUNTY ratified FREEMAN, THOMAS, and BAKER-BUFORD actions adverse to Plaintiff, such adverse actions became the official policy of Defendant COUNTY in retaliation for Plaintiff's exercise of the rights set forth above under the First Amendment.

98.     The actions by and on behalf of Defendant COUNTY set forth in this count were not unique events of the violations set forth herein. On information and belief, further similar events of wrongful actions on the part of Defendant COUNTY and/or its employees or agents have taken place, such events combining to determine a pattern of similar wrongful and illegal

behavior.

99.     As a direct and proximate result of the actions of Defendant COUNTY, Plaintiff suffered the adverse actions set forth above. She suffered lost wages, benefits, and other tangible damages. Plaintiff has also sustained emotional pain and suffering damages, loss of the capacity for the enjoyment of life, and other intangible damages. These losses have occurred in the past, are occurring at present, and are likely to occur into the future. Plaintiff is entitled under this count to an award of costs and attorney's fees under 42 U.S.C. §1988.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

(a)     that process issue and this court take jurisdiction over this cause;

(b)     that this court grant equitable relief against Defendants under the count set forth above, mandating Defendants' obedience to the laws enumerated herein and providing other equitable relief to Plaintiff;

(c)     that this court enter judgment against Defendants and for Plaintiff awarding damages to Plaintiff from Defendants for Defendants' violations of law enumerated herein;

(d)     that this court enter judgment against Defendants and for Plaintiff permanently enjoining Defendants from future violations of law enumerated herein;

(e)     that this court enter judgment against Defendants and for Plaintiff awarding Plaintiff costs and attorney's fees as allowed by law;

(f)     that this court award Plaintiff interest as allowed by law; and

(g)     that this court grant such other and further relief as is just and proper under the circumstances.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury on all issues set forth herein which are so triable.

Dated this 14th day of September, 2016.

Respectfully submitted,

/s/ Marie A. Mattox
Marie A. Mattox [FBN 0739685]
MARIE A. MATTOX, P. A.
310 East Bradford Road
Tallahassee, FL 32303
Telephone:  (850) 383-4800
Facsimile:   (850) 383-4801

ATTORNEYS FOR PLAINTIFF