**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**NANCY KING, M.D.,**                    **CASE NO.: 8:16-cv-02651-VMC-TBM**
**THE OCCUPATIONAL**
**HEALTH CENTER, INC.,**
**and WORK LOSS**
**MANAGEMENT, INC.,**

      **Plaintiffs,**

**vs.**

**BOARD OF COUNTY COMMISSIONERS,**
**POLK COUNTY, FLORIDA;**
**KANDIS BAKER-BUFORD, individually;**
**LEA ANN THOMAS, individually; and**
**JIM FREEMAN, individually,**

      **Defendants.**

_____/

**<u>SECOND AMENDED COMPLAINT</u>**

Plaintiffs, NANCY KING, M.D.,  THE OCCUPATIONAL HEALTH CENTER, INC.,

and WORK LOSS MANAGEMENT, INC., hereby sue Defendants, BOARD OF COUNTY

COMMISSIONERS, POLK COUNTY, FLORIDA; KANDIS BAKER-BUFORD, individually;

LEA ANN THOMAS, individually; and JIM FREEMAN, individually, and allege:

**JURISDICTION**

1.      This is an action for damages in excess of Seventy Five Thousand Dollars

($75,000.00), injunctive and equitable relief, costs, and attorney's fees, brought under the First

Amendment to the United States Constitution, through 42 U.S.C. §1983, and also under Florida's

public employee whistleblower statute, §112.3187, *et seq*., Fla.Stats.

2.      Jurisdiction of this court is also invoked pursuant 28 U.S.C. §1331 (federal

question jurisdiction), 28 U.S.C. §1343 (civil rights claim jurisdiction), and 28 U.S.C. §1367

(supplemental jurisdiction).

## CONDITIONS PRECEDENT

3.      Plaintiff has satisfied all conditions precedent to filing this action, if any.

## THE PARTIES

4.      At all times pertinent hereto, Plaintiff, NANCY KING, has been a resident of

Florida. She was contracted with Defendant BOARD OF COUNTY COMMISSIONERS, POLK

COUNTY, FLORIDA, at all times pertinent hereto, and is *sui juris*.

5.      At all times pertinent hereto, Plaintiff, THE OCCUPATIONAL HEALTH

CENTER, INC. ("OHC"), has been a corporation authorized to conduct and conducting business

in Florida.  OHC is wholly owned and operated by Plaintiff KING.

6.      At all times pertinent hereto, Plaintiff, WORK LOSS MANAGEMENT, INC.,

provided drug screening and review for Defendant COUNTY.  Work Loss Management, Inc.

(WLM) is wholly owned and operated by Plaintiff KING.

7.      At all times pertinent hereto, Defendant, BOARD OF COUNTY

COMMISSIONERS, POLK COUNTY, FLORIDA ("the COUNTY"), has been authorized and

existing under the laws of Florida, and has been subject to Chapter 112, Fla.Stats.

8.      At all times pertinent hereto, Defendant, JIM FREEMAN, has been employed by

Defendant COUNTY as its County Manager, has taken actions in violation of the First

Amendment to the United States Constitution within the jurisdictional boundaries of this court,

and is *sui juris*. He is sued in his individual capacity. According to Defendant COUNTY's

website, Defendant FREEMAN "is responsible for the proper administration of all affairs of the

county...[, w]ith the exception of the county attorney's office, Freeman appoints and manages all

2

of the county's nearly 2,000 employees... and is responsible for proper administration of the Board of County Commissioners' adopted budget." According to the organizational chart set forth on Defendant COUNTY's website, Defendant FREEMAN directly supervises Defendant THOMAS in her role as Deputy County Manager, directly supervises Defendant BAKER-BUFORD in her role in running Defendant COUNTY's equity office, and directly supervises Gary Hester in his role as Deputy County Manager, who in turn directly supervises Tony Stravino in his role as Fire Chief.

9.      At all times pertinent hereto, Defendant, LEA ANN THOMAS, has been employed by Defendant COUNTY as a Deputy County Manager for support services and human services, has taken actions in violation of the First Amendment to the United States Constitution within the jurisdictional boundaries of this court, and is *sui juris*. She is sued in her individual capacity. According to the organizational chart set forth on Defendant COUNTY's website, Defendant THOMAS directly supervises Defendant BAKER-BUFORD in her role as Director of Human Resources.

10.      At all times pertinent hereto, Defendant, KANDIS BAKER-BUFORD ("BUFORD"; collectively with Defendants FREEMAN and THOMAS, "the Individual Defendants"), has been employed by Defendant COUNTY, both as its Director of Human Resources and its Equity Office Director, has taken actions in violation of the First Amendment to the United States Constitution within the jurisdictional boundaries of this court, and is *sui juris*. She is sued in her individual capacity.

**GENERAL FACTS**

11.      Plaintiff KING, a physician, who is white, started working as Occupational Medicine Medical Director for Defendant COUNTY in October, 2000. Defendant COUNTY

renewed her three-year contract five consecutive times for fifteen (15) years without ever using the statutory request for proposal ("RFP") process.

12.     More specifically, at all pertinent times, Plaintiff KING was both an owner and employee of Plaintiffs OHC and WLM, and either was employed directly by Defendant COUNTY as its Occupational Medicine Medical Director or, alternatively, was employed by Plaintiffs OHC and WLM, which in turn were employed or contracted by Defendant COUNTY for her performance of the duties of Occupational Medicine Medical Director.

13.     In her position as Defendant COUNTY's Occupational Medical Director, Plaintiff KING oversaw the administration of physicals, drug testing, and worker's compensation claims for Defendant COUNTY. This included performing all the fitness-for-duty evaluations that Defendant COUNTY required.

14.     On December 26, 2013, Plaintiff KING's physician assistant, Kelly Manion, performed a pre-employment physical examination on an African American male ("J"), who Defendant COUNTY had recruited to be a fire fighter. Manion determined that J was medically unqualified. At the time, there was an ongoing effort by Defendant COUNTY to recruit and hire African American employees into certain positions, which may have included fire fighters.

15.     In November 2014, Plaintiff KING learned that J had been in the fire fighter training program and on Defendant COUNTY's payroll since his medical examination or shortly thereafter, despite being medically unqualified. Plaintiff KING was asked to review J's medical records and make a fitness-for-duty determination. Plaintiff KING said she would have to see J personally in her office because he had not been examined since December 2013.

16.     A few days later, Michael Kushner, Defendant COUNTY's Director of Risk Management, requested that Plaintiff KING inform Defendant BUFORD that she was examining

Mr. J.

17.     Defendant BUFORD, an African-American female, is the human resources director for Defendant COUNTY, as well as the diversity director, and the director of the Defendant COUNTY's EEOC office.

18.     On November 14, 2014 Defendant BUFORD told Plaintiff KING that it would be inappropriate for her to see J because he had already been cleared by his treating physician, Dr. Ackerman. Plaintiff KING told her that she had been asked to give a determination and that she had to see J to do so. Defendant BUFORD repeated that Plaintiff KING could not see J and that she would handle the issue with Kushner.

19.     Plaintiff KING proceeded to call Kushner and advised him of the conversation she had just had with Defendant BUFORD.

20.     On December 1, 2014, Plaintiff KING received an email from Kushner outlining a conversation with Defendant BUFORD and requesting that Plaintiff review J's medical records to determine whether or not they contained falsified medical information. In her effort to comply with this request, Plaintiff KING requested medical records from the employee health services clinic. During her review, Plaintiff KING noted that some of the medical records from J's treating physicians had been provided to the employee health clinic directly by Defendant BUFORD in an unusual and completely unprecedented manner, as opposed to J submitting medical records directly to the employee health services clinic as he had been instructed to do.

21.     On December 10, 2014, in response to Kushner's request that Plaintiff KING review the records as discussed in paragraph 20 above, she contacted Kushner at which time she advised him that she had completed the records review, and that given the contentious nature of the case she was recommending a second opinion from a specialist. During that conversation,

Plaintiff KING told Kushner that she could not qualify J for duty, and also that Defendant

BUFORD had repeatedly told her that she could not even examine him.  Plaintiff reported,

during that discussion, at the very least, a violation of Defendant's policies on medical clearance

requirements for fire fighters working for Defendant COUNTY and interference in the medical

clearance requirements for fire fighters by BUFORD.  This discussion was an "inquiry" in which

Kushner asked Plaintiff to obtain information and report back to him thereafter as related in this

and paragraph 20 above.  .

22.     Diane Mulloney, Defendant COUNTY's Employee Health Manager, then

emailed Defendant BUFORD and told her that an appointment had been made for J with Plaintiff

KING's colleague, Dr. James McCluskey, for January 27, 2015. Defendant BUFORD responded

that J was not available because of a class conflict and he would have to reschedule. The

appointment was rescheduled to February 6, 2015.

23.     On January 21, 2015, Plaintiff KING was copied on an email stream between

Mulloney and Defendant BUFORD. Defendant BUFORD was demanding to know Dr.

McCluskey's credentials. Mulloney sent Defendant BUFORD Dr. McCluskey's curriculum

vitae, as well as documentation from Dr. Ackerman indicating that J that was to be re-evaluated

if he experienced symptoms while exerting himself.

24.     On February 5, 2015, Dr. McCluskey received a call from an unknown female

who represented herself to be J's attorney. She informed Dr. McCluskey that "my client" would

not be going to his appointment the following day. Plaintiff KING had no idea that J was

represented by counsel. Plaintiff KING then made a public records request, which showed that

the call had actually come from Sharon Mathis' phone in Defendant BUFORD's department.

25.     On March 2, 2015, Kushner emailed Defendant BUFORD and advised her that

Plaintiff KING had sole discretion in making medical determinations on behalf of Defendant COUNTY. Defendant BUFORD insisted that Plaintiff KING should have provided a panel of three physicians for J to choose from if she wanted a second opinion; however, this would have represented a deviation from normal clinic protocol.

26.     In early March 2015, Plaintiff KING tried to make an appointment to meet Defendant FREEMAN, Defendant COUNTY's County Manager, to discuss her public safety concerns and Defendant BUFORD's bizarre and aggressive involvement with J. Plaintiff KING was not given the opportunity to talk to Defendant FREEMAN, and was referred to Defendant COUNTY's Deputy County Manager, Defendant THOMAS. A meeting was scheduled for March 12, 2015, but Defendant THOMAS subsequently cancelled.

27.     On March 12, 2015, Plaintiff KING faxed a letter to Dr. Ackerman outlining her position with Defendant COUNTY and her concerns regarding J. Included within the letter were the accepted medical guidelines for physicians evaluating fire fighters that pertained to J's diagnosis. In her letter, she advised Dr. Ackerman of his deviation from and/or lack of compliance with NFPA 1582 medical standards regarding J, and asked him to please render an opinion regarding J's fitness for duty as a fire fighter given this additional information.

28.     Dr. Ackerman thereafter called Plaintiff KING because he was angry about the number of calls and letters he was getting regarding Defendant COUNTY and J.

29.     In that telephone call, Dr. Ackerman admitted that he had been unaware of the guidelines, and that when he reviewed them, he immediately agreed that J was not medically qualified to be a fire fighter based upon the NFPA guidelines.

30.     On March 12, 2015 Plaintiff KING emailed Defendant BUFORD and told her about her conversation with Dr. Ackerman. Plaintiff KING also advised Defendant BUFORD

that she would be Dr. Ackerman's sole point of contact regarding J and that any releases, etc., would be received and distributed only by her as appropriate.

31.     On March 13, 2015, Plaintiff KING sent a certified letter to J apprising him of her conversation with Dr. Ackerman and advising him that it was her medical determination that he was not qualified to perform the essential functions of a fire fighter.

32.     On March 16, 2015, Plaintiff KING received an email from Defendant BUFORD warning her that she needed to "treat all employees the same." Attached to the email was a letter from Dr. Ackerman, J's personal physician, clearing J for duty, dated March 10, 2015, two days before Dr. Ackerman was made aware of the medical guidelines and his conversation with Plaintiff.

33.     After a second cancelled appointment, Plaintiff KING was finally able to speak to Defendant THOMAS on March 31, 2015. In that conversation, she outlined her concerns and provided Defendant THOMAS with some written documentation to substantiate the multiple oddities with J, along with Defendant BUFORD's unprecedented involvement in his medical clearance.  Plaintiff told Defendant THOMAS during this meeting that Plaintiff was concerned about J's ability to safely perform the essential functions of his job, the public safety concerns that could be posed by J if he was a fire fighter, as well as the multiple actions by Defendant BUFORD interfering with the medical clearance of J.  Defendant THOMAS was provided with telephone records from Dr. McCluskey on February 5, 2015 through which Dr. McCluskey received a call from BUFORD's office in which the person stated that "my client", i.e., J, would not be attending the appointment scheduled with him the following day.

34.     On April 1, 2015, Plaintiff KING sent Dr. Ackerman a state fire marshal medical clearance document for him to sign. Dr. Ackerman signed and returned it two days later, noting

that J was not medically qualified for fire fighter training. Plaintiff gave a copy of this letter to Defendant THOMAS.

35.     On April 6, 2015, J was dismissed from fire fighter training as he had been deemed medically unfit by Dr. Ackerman.

36.     Thereafter, on April 19, 2015, Plaintiff emailed Diane Mulloney, Defendant COUNTY'S Employee Health Services Clinic Director, copying Michael Kushner, both of whom were in positions to correct the actions that Plaintiff reported and both of whom are "local officials" under §112.3187, and attached a copy of a Chart that Plaintiff had prepared on J and the events surrounding his medical examinations.  In the chart, Plaintiff disclosed in writing the following:

A.  that Defendant BUFORD had instructed her on November 14, 2014 that it would be inappropriate for Plaintiff to examine J as he has already received medical clearance from his treating physician and that he would not be coming to Plaintiff's office for further evaluation, thus interfering with Plaintiff's ability to perform her duties as the final decisionmaker on medical examinations for Defendant COUNTY;

B.  that Plaintiff could not qualify J for the fire fighter position and that she had been instructed by BUFORD that Plaintiff would not have the opportunity to evaluate J. personally;

C.  that on March 12, 2015, Plaintiff had emailed a letter to Dr. Ackerman outlining her position with the Defendant COUNTY as well as expressing her concerns regarding J's fitness for duty as a fire fighter, in which correspondence Plaintiff advised Dr. Ackerman of the medical guidelines for physicians evaluating fire fighters;

D.  that on March 12, 2015, Plaintiff received a telephone call from Dr. Ackerman who

was angry about the number of telephone calls he had received from the Defendant COUNTY about J. Plaintiff then reported that Dr. Ackerman admitted to being pressured by J to sign a letter of clearance for J for firefighting duties;

E.  that she had received an email from BUFORD cautioning her to make sure that she treated all employees the same;

F.  that she had spoken to Defendant THOMAS on March 31, 2015 and outlined all of her concerns regarding the entire series of events including safety concerns for the general public if J was medically cleared as a fire fighter, that BUFORD was involved in an unprecedented involvement in the medical clearance of J and that BUFORD was interfering in the performance of Plaintiff's duties as one of the sole decisionmakers in medical clearance decisions for employees like J; and,

G.   that Dr. Ackerman found J unfit for fire fighter training.

37.     Determined to retain J, shortly thereafter, David Cash, Defendant COUNTY's fire chief, emailed Plaintiff KING on April 21, 2015, asking her whether she felt J could work as an Emergency Medical Technician ("EMT") without firefighting responsibilities. Plaintiff KING recommended that an outside occupational medicine physician perform the evaluation because of the contentious nature of the case.

38.     The fitness-for-duty exam for a position as an EMT was completed by Dr. Gupta on June 9, 2015. However, Dr. Gupta said that he would require additional tests before he could make a determination about J's fitness. Plaintiff KING provided this information to Kushner on June 25, 2015.

39.      Plaintiff KING subsequently received a call from Gary Hester, Defendant COUNTY's Deputy County Manager. Hester told Plaintiff KING that Defendant COUNTY

would not agree to the extra tests that Dr. Gupta asked for and would not require nor ask J to complete those recommended tests. Hester said Plaintiff KING was imposing requirements on J that she had never imposed on any other applicant. Plaintiff KING tried to explain that J's condition may have changed in the eighteen (18) months since his pre-employment examination. She also reminded Hester that each and every fitness-for-duty examination is given individual consideration. Hester became belligerent and raised his voice at Plaintiff KING.

40.     On June 25, 2015, Plaintiff issued her final determination letter finding that J was medically unfit for the EMT position.  Despite her determination, Defendant COUNTY placed J in an EMT position despite medical recommendations. On September 11, 2015, Plaintiff KING was finally able to meet with Defendant FREEMAN. During this inquiry, Plaintiff told Defendant FREEMAN about everything that had been going on as described above, which she understood to constitute both violations of law, rule or regulation on the part of Defendant COUNTY, and malfeasance, misfeasance or gross misconduct on the part of Defendant COUNTY. Plaintiff told Defendant Freeman about the oddities of the involvement of Defendant BUFORD in J's medical clearance and that he had never been medically cleared by Plaintiff. Plaintiff KING told Defendant FREEMAN that her priority was the safety of J, of his coworkers, and of the public, and that there were public safety concerns with J working as a fire fighter or EMT. It was not part of Plaintiff KING's ordinary job duties to meet with Defendant FREEMAN nor to disclose the public safety issues that she discussed with him at that time. Defendant FREEMAN responded, "We just need your help on this, Dr. King." Plaintiff KING replied that her responsibility to Defendant COUNTY was to make sure that personnel were medically fit for duty, and that she would not compromise her medical judgment for anyone. Defendant FREEMAN said he understood, and that he did not expect Plaintiff KING to compromise

herself.  As County Manager, Defendant FREEMAN would have known that fire fighters are required to meet medical qualifications set forth in §§633.408 and 412, Florida Statutes and that Plaintiff was reporting violations of those laws as well as safety and ethical standards pertaining to the medical clearance of fire fighters.

41.     During this meeting Plaintiff told Defendant FREEMAN of her concerns regarding the potential reverse discrimination actions other medically unqualified fire fighters might take who were never afforded the opportunity to work for the Defendant COUNTY once they were deemed to be medically unqualified by Plaintiff and/or others through the Defendant COUNTY'S Employee Wellness Center.  She advised FREEMAN of multiple instances where J, as an employee of Defendant County, falsified medical documents yet J was permitted to remain on the County payroll. It was not part of Plaintiff's ordinary job duties to report potential reverse racial discrimination with white fire fighters who were medically unqualified but were treated less favorably than J, which would have been a matter of public concern to the citizens in Polk County.

42.     Plaintiff KING then informed Defendant FREEMAN that she would be a poor witness for Defendant COUNTY if there was a catastrophic event because of J's condition. The meeting ended cordially and Plaintiff KING thanked Defendant FREEMAN for allowing her to speak with him.

43.     Around mid-September, 2015, Plaintiff KING was advised by Kushner that Defendant COUNTY was putting the occupational medicine medical director contract (her contract) out for bid through an RFP for the first time in over fifteen (15) years. Kushner was surprised that Defendant COUNTY was requesting an RFP because it was his understanding that there was no statutory requirement for one. Plaintiff KING's contract was due to expire on

September 30, 2015, but Kushner requested that Plaintiff KING agree to a four month extension to fill the gap. Plaintiff KING so agreed, but no written contract extension was ever executed between Plaintiff KING and Defendant COUNTY. Kushner also told Plaintiff that he was told by Defendant THOMAS to personally contact only the University of South Florida to engage in the RFP process despite the fact that four (4) other vendors including Plaintiff KING had been recommended to the procurement office for participation by the Risk Management department

44.     Pursuant to the RFP, on December 16, 2015, Plaintiff KING submitted her proposal to Defendant COUNTY's procurement office. Only Plaintiff KING and the University of South Florida ("USF") submitted proposals to Defendant COUNTY.

45.     Defendant COUNTY's selection committee was made up of five members. None of Defendant COUNTY's county commissioners was appointed to serve on the selection committee as required on page 48 of Defendant COUNTY's August 6, 2010 purchasing procedures manual.

46.     The selection committee scored the proposals on February 4 2016, and decided it wanted to interview the applicants.

47.     On February 10, 2016, Plaintiff KING was interviewed by the selection committee regarding her proposal. Incredibly, Defendant THOMAS asked her, "based upon recent differences of expectations with the County Manager's office and that whole situation of care, what would you do differently or how would you handle that if we were starting in the beginning?"

48.     Plaintiff KING responded that she had requested to speak with Defendant COUNTY's labor attorney on three different occasions and was denied each time. Plaintiff further stated that should Defendant COUNTY select her organization, she would insist on

access to a labor attorney if she deemed necessary in the future. There was no admission of any wrongdoing. The other members of the committee had no idea what Defendant THOMAS meant in her question, and when Plaintiff KING asked if Defendant THOMAS would like for her to get into the "particulars," Defendant THOMAS replied "no, that would take too long." The question was not related to the proposal and could not have been asked of Plaintiff KING's competitor for the contract.

49.     Defendant COUNTY's procurement office issued a document on February 15, 2015, stating that the selection committee collectively decided not to make a recommendation to the board or commissioners despite the fact that Plaintiff KING had scored considerably higher than USF, as well as outranking USF.

50.     On March 1, 2016, Plaintiff KING sent an email to Diane Mulloney, and Defendant FREEMAN notifying them that she would be ending the current verbal contract on March 31, 2016, and that she would be willing to resume service on April 1, 2016 under the terms of her proposal, with a written contract. Plaintiff KING never received any response or acknowledgment from Defendant COUNTY regarding this matter.

51.     On March 24, 2016, Defendant COUNTY's procurement director formally rejected all proposals for the occupational health program, RFP no. 15-711.

52.     On April 22, 2016, Plaintiff KING met with Ed Smith, one of Defendant COUNTY's commissioners, to talk about the events set forth above, and he told Plaintiff KING that the RFP had been issued because "several people were embarrassed." Smith told Plaintiff KING that Defendant COUNTY had believed USF would "dominate" Plaintiff, get the contract, and that Plaintiff KING would "just fade away".

53.     Smith told Plaintiff KING that she "should get a bottle of whiskey, go home, and

let it go." Plaintiff KING protested that Defendant BUFORD had violated the essence of her job responsibilities. Smith responded that "had some of those folks been the same ethnicity as you or I, they would have been fired." He told Plaintiff KING that Defendant BUFORD had gotten Defendant FREEMAN out of trouble in the past and that she was "untouchable."

54.     Later that same day, Plaintiff KING met with Dr. McMicken, who had been on the selection committee. McMicken started the conversation by saying he heard that Plaintiff KING no longer wanted to work with Defendant COUNTY. Plaintiff told him that was not accurate.

55.     McMicken said that there was a consensus of the committee that the Defendant COUNTY should enter into contract negotiations with Plaintiff KING, and that USF should be embarrassed by their proposal. He stated that he had even offered to assist Defendant COUNTY with contract negotiations with Plaintiff KING.

56.     Plaintiff showed McMicken the email she received stating that the committee had agreed not to make a recommendation to Defendant COUNTY's board of commissioners. McMicken responded that that email was not accurate or correct at all. He further said that all five members of the committee had agreed that they should give the contract to Plaintiff KING.

57.     On April 26, 2016, Plaintiff KING met with Defendant COUNTY's employee Bob Page, who was also on the selection committee. Page confirmed to Plaintiff KING that the committee had voted to give the contract to her. He informed Plaintiff KING that the meeting minutes she provided to him and that had been prepared by Defendant COUNTY were incorrect.

58.     Moving forward, Defendant COUNTY was completely unprepared to continue without a medical director, and therefore rejected all proposals simply to get rid of Plaintiff KING.  Between March 24, 2016, and November, 2016, after this Complaint was originally

filed, Defendant COUNTY did not have a contract with anyone for occupational health services. Instead, Defendant COUNTY had been using local providers. Defendant COUNTY was well aware, or should have been aware, that it was not legally required to issue an RFP for the contract pursuant to §287.057, Fla.Stats., which section exempts health services from the competitive-solicitation requirement. Written correspondence between Defendant THOMAS and someone named "Sandi" dated May 19, 2016 documents a request to amend an existing ordinance to make sure Defendant COUNTY would not have to go through the process again now that Plaintiff was no longer involved.

59.     Defendant COUNTY used the RFP process to wrongfully terminate Plaintiff KING because she had refused to provide medical clearance which would have permitted Defendant BUFORD to continue to hire and have Defendant COUNTY employ a medically unqualified applicant, because she discussed and reported safety concerns with Defendant COUNTY's management, and because she refused to medically qualify J, who is African American. Defendant COUNTY also wanted Plaintiff KING to rubberstamp J's application because he should not have been put on payroll in January 2014, and it did not want to expose itself to any liability, which Plaintiff KING refused to do.

60.     Plaintiffs have retained the undersigned to represent their interests in this cause and are obligated to pay a fee for these services. Defendants should be made to pay said fee, along with costs incurred in connection with this action, under applicable law.

### COUNT I-PUBLIC EMPLOYEE WHISTLEBLOWER RETALIATION
### (brought by Plaintiff KING against Defendant COUNTY)

61.     Paragraphs 1-60 above are realleged and incorporated.

62.     This count sets forth a claim on behalf of Plaintiff KING against Defendant COUNTY under §112.3187, *et seq*., Fla.Stats.

63.     As stated more specifically in part above, Plaintiff KING  reported and disclosed, verbally and in writing, violations of law, rules or regulations, gross mismanagement, malfeasance, misfeasance, gross waste of public funds and/or gross neglect of duty committed by one or more employees, agents or independent contractors of Defendant COUNTY, to persons both inside and outside of her normal chain of command, and to others having the authority to investigate, police, manage and otherwise remedy the violations that she reported.  She reported that Defendant BUFORD and thus Defendant COUNTY, violated the rules of the Defendant COUNTY regarding allowing medically unqualified fire fighters to become employed with Defendant County.  She  reported that one or more employees of the Defendant, including without limitation Defendant BUFORD, interfered with the medical clearance requirements for Defendant COUNTY fire fighters and a female calling from her office falsely stated that "her client", , i.e., J, would not be showing up for his medical clearance appointment.  The violations of law, rules or regulations subject of Plaintiff KING's reports included, but were not limited to, violations of 18 U.S.C. §1341, entitled "Frauds and swindles," conspiracies to violate 18 U.S.C. §1341, and race-based employment discrimination under Title VII, 42 U.S.C. §1981, and Chapter 760, Fla.Stats. Further, it is Plaintiff KING's understanding that Defendant COUNTY's failure to follow  the National Fire Protection Association ("NFPA") 1582 standards and other laws, rules and regulations identified herein, demonstrated in her reports and disclosures, constituted violations of §§633.408 and/or 633.412, Fla.Stats. and/or constituted actions beneath an applicable standard of care.

64.     After reporting these matters and/or participating in inquiries, investigations, hearings, or other agency inquiries, as related in part above, Plaintiff KING was the victim of retaliatory actions set forth in part above.

65.     Plaintiff's adverse treatment, including her termination, contract nonrenewal and/or the failure to award the RFP, was a direct adverse result of her reporting violations of laws, rules or regulations, of her reporting malfeasance, misfeasance or gross misconduct, and/or of her participating in investigations, hearings or other inquiries, specified in part above.

66.     The actions of all employees and agents of Defendant COUNTY who affected Plaintiff KING's relationship with Defendant COUNTY adversely did so at least in part in retaliation against her for her "whistleblowing" activities.

67.     As a direct and proximate result of the actions taken against her by Defendant COUNTY, Plaintiff KING suffered injury, including but not limited to past and future wage losses, and other tangible and intangible damages. These damages have occurred in the past, are occurring at present, and will likely continue into the future.

### COUNT II-PUBLIC EMPLOYEE WHISTLEBLOWER RETALIATION
### (brought by Plaintiffs OHC and WLM against Defendant COUNTY)

68.     Paragraphs 1-60 above are realleged and incorporated.

69.     This count sets forth a claim on behalf of Plaintiffs OHC and WLM against Defendant COUNTY under §112.3187, *et seq.*, Fla.Stats.

70.     As stated more specifically in part above, Plaintiffs OHC and WLM, through Plaintiff KING, reported and disclosed, verbally and in writing, violations of law, rules or regulations, gross mismanagement, malfeasance, misfeasance, gross waste of public funds and/or gross neglect of duty committed by one or more employees, agents or independent contractors of Defendant COUNTY, to persons both inside and outside of her normal chain of command, and to others having the authority to investigate, police, manage and otherwise remedy the violations that she reported. She reported that Defendant BUFORD and thus Defendant COUNTY, violated the rules of the Defendant COUNTY regarding allowing unqualified fire fighters to become

employed with Defendant County.  She reported that one or more employees of the Defendant, including without limitation Defendant BUFORD, interfered with the medical clearance requirements for Defendant COUNTY fire fighters and a female in BUFORD'S office identified J as her client in a telephone call to Dr. McCluskey on February 5, 2015..  The violations of law, rules or regulations subject of Plaintiff KING's reports included, but were not limited to, violations of 18 U.S.C. §1341, entitled "Frauds and swindles," conspiracies to violate 18 U.S.C. §1341, and race-based employment discrimination under Title VII, 42 U.S.C. §1981, and Chapter 760, Fla.Stats.  Further, it is Plaintiff KING's understanding that Defendant COUNTY's failure to follow  the National Fire Protection Association ("NFPA") 1582 standards and other laws, rules and regulations identified herein, demonstrated in her reports and disclosures, constituted violations of §§633.408 and/or 633.412, Fla.Stats. and/or constituted actions beneath an applicable standard of care.

71.     After reporting these matters and/or participating in investigations, hearings, or other agency inquiries, as related in part above, Plaintiffs OHC and WLM were the victim of retaliatory actions set forth in part above.

72.     Plaintiffs OHC's and WLM's adverse treatment, including Defendant COUNTY's wrongful withholding of the occupational health services contract, contract nonrenewal and/or the failure to award the RFP was a direct adverse result of Plaintiff KING reporting on behalf of Plaintiffs OHC and WLM violations of laws, rules or regulations, malfeasance, misfeasance or gross misconduct, and/or of Plaintiffs OHC and WLM, through Plaintiff KING, participating in investigations, hearings or other inquiries, specified in part above.

73.     The actions of all employees and agents of Defendant COUNTY who affected

Plaintiffs OHC's and WLM's relationship with Defendant COUNTY adversely did so at least in part in retaliation against Plaintiffs OHC and WLM for its "whistleblowing" activities.

74.     As a direct and proximate result of the actions taken against it by Defendant COUNTY, Plaintiffs have suffered injury, including but not limited to past and future wage losses, loss of benefits, and other tangible damages. These damages have occurred in the past, are occurring at present, and will likely continue into the future.

## COUNT III-FIRST AMENDMENT RETALIATION
### (brought by Plaintiff KING against the Individual Defendants)

75.     Paragraphs 1-60 above are realleged and incorporated.

76.     This count sets forth claims on behalf of Plaintiff KING against the Individual Defendants for First Amendment retaliation, and is brought through 42 U.S.C. §1983. This count is pled in the alternative.

77.     The Individual Defendants operated to violate Plaintiff KING's rights under the First Amendment. These violations were of a type and character as to which any reasonable person would be aware. Plaintiff KING's rights to freedoms of speech and expression were violated. Public contractors like Plaintiff KING have the right to engage in First Amendment activities without the fear of reprisal.

78.     Plaintiff KING, as set forth in part above, engaged in constitutionally protected activity by speaking on matters of public concern and beyond the scope of her job duties, including but not limited to her participation in inquiries and investigations and speaking out on safety matters that are of public concern to the citizens of Defendant COUNTY.

79.     After engaging in protected activity as related in part above, Plaintiff KING was the victim of retaliatory actions as set forth in part above. The Individual Defendants infringed on Plaintiff KING's constitutionally protected interests under the First Amendment, as set forth

20

in part above. The Individual Defendants' actions, set forth in part above, were the types of retaliatory conduct that would deter a person of ordinary sensibilities from exercising his or her First Amendment rights. Plaintiff KING's protected activity was a substantial or motivating factor in the adverse actions taken against her.

80.     The conduct of the Individual Defendants was in callous and willful disregard of Plaintiff KING's constitutional rights, thereby authorizing an award of punitive damages against them.

81.     The Individual Defendants are persons under the laws applicable to this action. The Individual Defendants are liable, jointly and severally with Defendant COUNTY, for their actions, individually and in concert, which violated the civil rights of Plaintiff KING under the First Amendment.

82.     Each of the Individual Defendants personally participated in the adverse actions against Plaintiff KING in violation of her First Amendment rights set forth above.

83.     Each of the Individual Defendants were a main participant, a policymaker, and/or made decisions to act adversely to Plaintiff KING in her relationship with Defendant COUNTY after she engaged in protected First Amendment activity.

84.     At all times pertinent hereto, the Individual Defendants were acting under color of state law, are persons under the applicable law, and they were acting under color of state law while doing so when they made the decisions and/or participated in the adverse actions against Plaintiff KING.

85.     The Individual Defendants acted with malice against Plaintiff KING and/or in reckless disregard of her clearly established rights under the First Amendment.

86.     As a direct and proximate result of the actions of the Individual Defendants,

Plaintiff KING suffered the adverse actions set forth above. She suffered lost wages, benefits, and other tangible damages. Plaintiff KING has also sustained emotional pain and suffering damages, loss of the capacity for the enjoyment of life, and other intangible damages. These losses have occurred in the past, are occurring at present, and are likely to continue into the future. Plaintiff KING is entitled to punitive damages against the Individual Defendants under this count.

### COUNT IV-FIRST AMENDMENT RETALIATION
### (brought by Plaintiff KING against Defendant COUNTY)

87.     Paragraphs 1-60 above are realleged and incorporated.

88.     This count sets forth a claim on behalf of Plaintiff KING against Defendant COUNTY for First Amendment retaliation, and is brought through 42 U.S.C. §1983. This count is pled in the alternative.

89.     Defendant COUNTY operated to violate Plaintiff KING's rights under the  First Amendment. These violations were of a type and character as to which any reasonable person would be aware. Plaintiff KING's rights to freedoms of speech and expression were violated. Public employees/contractors like Plaintiff KING have the right to engage in First Amendment activities without the fear of reprisal.

90.     Plaintiff KING, as set forth in part above, engaged in constitutionally protected activity by speaking on matters of public concern and beyond the scope of her job duties, including but not limited to her participation in inquiries and investigations and speaking out on safety matters that are of public concern to the citizens of Defendant COUNTY.

91.     After engaging in protected activity as related in part above, Plaintiff KING was the victim of retaliatory actions as set forth in part above. Defendant COUNTY infringed on Plaintiff KING's constitutionally protected interests under the First Amendment, as set forth in

part above. Defendant COUNTY's actions, set forth in part above, were the types of retaliatory conduct that would deter a person of ordinary sensibilities from exercising his or her First Amendment rights. Plaintiff KING's protected activity was a substantial or motivating factor in the adverse actions taken against her.

92.     Defendant COUNTY retaliated against Plaintiff KING for her First Amendment activity as alleged herein by taking adverse actions against her, as set forth in part above.

93.     Defendant COUNTY has deprived Plaintiff KING of her rights to freedom of speech and expression, protected by the First Amendment.

94.     Defendant COUNTY is a person under the laws applicable to this action. Defendant COUNTY is liable, jointly and severally with the Individual Defendants, for its actions, individually and in concert, which violated the civil rights of Plaintiff KING under the First Amendment.

95.     Defendant COUNTY misused its power, possessed by virtue of state law and made possible only because it was clothed with the authority of state law. The violations of Plaintiff KING's rights, as described above, occurred under color of state law and are actionable under 42 U.S.C. §1983.

96.     Defendant FREEMAN, as County Manager, Defendant THOMAS, as Deputy County Manager, and Defendant BUFORD, as Human Resources Director, personally participated in the actions adverse to Plaintiff KING and/or in the decisions to engage in such actions, in violation of her rights to free speech and expression under the First Amendment.

97.     One or more of the Individual Defendants were final decisionmakers in the actions taken against Plaintiff KING complained of herein.

98.     Defendant COUNTY, through one or more of the Individual Defendants and

other employees or agents, also failed to implement adequate hiring, retaining, staffing, training and/or supervisory procedures, as a direct result of which Plaintiff KING's First Amendment rights were violated.

99.     One or more of the Individual Defendants had final policymaking authority for Defendant COUNTY, and were responsible for hiring, retaining, staffing, training, and supervising other employees of the Defendant COUNTY and, when necessary, for investigating alleged wrongdoing by its employees. Alternatively, in the event it were determined that none of the Individual Defendants had final policymaking authority for Defendant COUNTY, one or more nonetheless functioned as the final policymaker for Defendant COUNTY in connection with the allegations herein, their decisions and actions having been rubber-stamped at all higher levels of authority.

100.     Defendant COUNTY, after notice of the constitutional violations alleged herein, officially sanctioned the actions and refused to discipline its agents and employees, which sanction and refusal established a policy, by a final policymaker, that directly or indirectly resulted in violations of Plaintiff KING's constitutional rights.

101.     Further, Defendant COUNTY ratified the actions of its employees, including the actions of one or more of the Individual Defendants, who acted adversely to Plaintiff KING in retaliation for her exercise of First Amendment rights.

102.     When Defendant COUNTY ratified one or more of the Individual Defendants' actions adverse to Plaintiff KING, such adverse actions became the official policy of Defendant COUNTY in retaliation for Plaintiff KING's exercise of the rights set forth above under the First Amendment.

103.     The actions by and on behalf of Defendant COUNTY set forth in this count were

not unique events of the violations set forth herein. On information and belief, further similar events of wrongful actions on the part of Defendant COUNTY and/or its employees or agents have taken place, such events combining to determine a pattern of similar wrongful and illegal behavior.

104.    As a direct and proximate result of the actions of Defendant COUNTY, Plaintiff suffered the adverse actions set forth in part above. She suffered lost wages, benefits, and other tangible damages. Plaintiff has also sustained emotional pain and suffering damages, loss of the capacity for the enjoyment of life, and other intangible damages. These losses have occurred in the past, are occurring at present, and are likely to continue into the future.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for the following relief:

(a)    that process issue and this court take jurisdiction over this cause;

(b)    that this court grant equitable relief against Defendants under the counts set forth above, mandating Defendants' obedience to the laws enumerated herein and providing other equitable relief to Plaintiffs;

(c)    that this court enter judgment against Defendants and for Plaintiffs awarding damages to Plaintiffs from Defendants for Defendants' violations of law enumerated herein;

(d)    that this court enter judgment against Defendants and for Plaintiffs permanently enjoining Defendants from future violations of law enumerated herein;

(e)    that this court enter judgment against Defendants and for Plaintiffs awarding Plaintiffs costs and attorneys' fees as allowed by law;

(f)    that this court award Plaintiffs interest as allowed by law; and

(g)    that this court grant such other and further relief as is just and proper under

the circumstances.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury on all issues set forth herein which are so triable.

Respectfully submitted:

/s/ Marie A. Mattox
Marie A. Mattox [FBN 0739685]
MARIE A. MATTOX, P. A.
310 East Bradford Road
Tallahassee, FL 32303
Telephone:  (850) 383-4800
Facsimile:   (850) 383-4801

Charlotte F. Kelly [FBN 090105]
John Bales Attorneys
625 East Twiggs Street
Tampa, FL 33602
Telephone: (813) 224-9100
Facsimile: (813) 224-9109

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been served upon all counsel of record by CM/ECF this 23rd day of January, 2017.

/s/ Marie A. Mattox
Marie A. Mattox