UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

NANCY KING, THE OCCUPATIONAL
HEALTH CENTER, INC., and
WORK LOSS MANAGEMENT, INC.,

      Plaintiffs,

v.                                   Case No. 8:16-cv-2651-T-33TBM

BOARD OF COUNTY COMMISSIONERS,
POLK COUNTY, FLORIDA, KANDIS
BAKER-BUFORD, individually,
LEA ANN THOMAS, individually,
and JIM FREEMAN, individually,

      Defendants.
_____/

**ORDER**

This matter comes before the Court pursuant to Defendants Board of County Commissioners, Polk County, Florida's Motion to Dismiss and Strike (Doc. # 48), Jim Freeman's Motion to Dismiss and Strike (Doc. # 49), Kandis Baker-Buford's Motion to Dismiss and Strike (Doc. # 50), and Lea Ann Thomas's Motion to Dismiss and Strike (Doc. # 51). Plaintiffs Dr. Nancy King, the Occupational Health Center, Inc., and Work Loss Management, Inc., filed responses on March 6, 2017. (Doc. ## 56-57). For the reasons that follow, the Court denies the Motions.

1

I.   **Background**

King is the owner and an employee of both the Occupational Health Center (OHC), which contracts with Polk County to provide medical services, and Work Loss Management, Inc. (WLM), which contracts with the County to provide drug screenings. (Doc. # 43 at ¶¶ 5-6, 11-12). Through OHC and WLM, King worked as the occupational medicine medical director for the County from October of 2000 until March of 2016. (Id. at ¶¶ 11-12, 51). The contract was renewed for three consecutive five-year terms without the County using a bidding process. (Id. at ¶ 11). King's duties included "overs[eeing] the administration of physicals, drug testing, and worker's compensation claims" and "performing all the fitness-for-duty evaluations" for the County. (Id. at ¶ 13).

In December of 2013, one of King's physician assistants performed a fitness-for-duty examination on Mr. J.,[1] who had been recruited to be a firefighter by the County in its effort to increase diversity. (Id. at ¶ 14). The physician assistant determined that Mr. J was not qualified to be a firefighter. (Id.). Yet, in November of 2014, King learned that Mr. J was in the County's firefighter training program. (Id. at ¶ 15).

_____

[1] For privacy reasons, the Second Amended Complaint uses a pseudonym, as does the Court.

The County again asked King to review Mr. J's medical records and make a fitness-for-duty determination based on the records. (Id.). King stated that she would need to personally examine Mr. J to make that determination. (Id.).

A few days later, the County's director of risk management, Michael Kushner, asked King to tell Baker-Buford, the County's human resources and diversity director, that King would be examining Mr. J. (Id. at ¶¶ 16-17). Baker-Buford told King that she could not re-examine Mr. J because Mr. J's personal physician had already cleared him for duty. (Id. at ¶ 18). King reported Baker-Buford's refusal to Kushner, who later requested in an email that King review Mr. J's medical records "to determine whether or not they contained falsified medical information." (Id. at ¶¶ 19-20).

When King requested Mr. J's medical records that had been provided to the employee health clinic, she discovered that Baker-Buford had submitted some of Mr. J's records, although employees typically submit their own. (Id. at ¶ 20). After reviewing the records, King contacted Kushner and suggested that Mr. J undergo an examination by a specialist for a second opinion. (Id. at ¶ 21). Her conversation with Kushner "reported, at the very least, a violation of [the County's] policies on medical clearance requirements for

3

firefighters working for [the County] and interference in the medical clearance requirements for firefighters by [Baker-Buford]." (Id.). According to King, this discussion qualified as an "inquiry" because "Kushner asked [King] to obtain information and report back to him thereafter." (Id.).

An appointment with a specialist was scheduled in February of 2015, but the specialist received a phone call cancelling the appointment from a woman purporting to be Mr. J's attorney. (Id. at ¶¶ 22-24). A public records request revealed that the phone call had been made from an employee's phone in Baker-Buford's department. (Id. at ¶ 24). Subsequently, Kushner emailed Baker-Buford and emphasized to her that King "had sole discretion in making medical determinations on behalf of [the County]," but Baker-Buford insisted that King should not have chosen the specialist to examine Mr. J. (Id. at ¶ 25).

At that time, King tried but was unable to arrange a meeting with either the county manager, Freeman, or the deputy county manager for support services and human services, Thomas, to discuss her concerns. (Id. at ¶¶ 8-9, 26). Thereafter, King contacted Mr. J's physician and asked him whether he thought Mr. J met the specific physical guidelines for firefighters. (Id. at ¶ 27). The doctor "admitted that he

had been unaware of the guidelines" and agreed that Mr. J was not medically fit. (Id. at ¶ 29). After Baker-Buford discovered Mr. J had been found unfit, she emailed King, "warning her that she needed to 'treat all employees the same.'" (Id. at ¶ 32).

King was then able to meet with Thomas, the deputy county manager, to discuss her concerns "about [Mr.] J's ability to safely perform the essential functions of his job, the public safety concerns that could be posed by [Mr.] J if he was a firefighter, as well as the multiple actions by [Baker-Buford] interfering with the medical clearance of [Mr.] J." (Id. at ¶ 33). Soon thereafter, in April of 2015, Mr. J was dismissed from firefighter training, but was still being considered for an EMT position. (Id. at ¶¶ 35, 37). Then, King emailed Diane Mulloney, the County's employee health services clinic director, and Kushner. (Id. at ¶ 36). King attached a chart to the email, which disclosed the events surrounding King's determination that Mr. J was unfit to be a firefighter, including her conversations with Baker-Buford and Thomas. (Id.).

After a different physician concluded that more tests were required to determine whether Mr. J was medically fit to be an EMT, another deputy county manager informed King that

the County would not require Mr. J to take the tests. (Id. at ¶¶ 38-39). Nevertheless, King "issued her final determination letter finding that [Mr.] J was medically unfit for the EMT position" on June 25, 2015. (Id. at ¶ 40). But, the County ignored King's determination and "placed [Mr.] J in an EMT position." (Id.).

Eventually, in September of 2015, King met with the county manager, Freeman. Freeman "is responsible for the proper administration of all affairs of the [C]ounty . . . [, w]ith the exception of the county attorney's office, Freeman appoints and manages all of the [C]ounty's nearly 2,000 employees . . . and is responsible for proper administration of the Board of County Commissioners' adopted budget." (Id. at ¶ 8). During the meeting, King explained her concerns over Mr. J's fitness and Baker-Buford's involvement, "which [King] understood to constitute both violations of law, rule or regulation" and "malfeasance, misfeasance or gross misconduct" by the County. (Id. at ¶ 40). King told Freeman "that her priority was the safety of [Mr.] J, of his coworkers, and of the public, and that there were public safety concerns with [Mr.] J working as a firefighter or EMT." (Id.). When Freeman said "We just need your help on this, Dr. King," King responded that "her responsibility to [the County]

6

was to make sure that personnel were medically fit for duty, and that she would not compromise her medical judgment for anyone." (Id.).

She further disclosed the "multiple instances where [Mr.] J, as an employee of [the] County, falsified medical documents yet [] was permitted to remain on the County payroll." (Id. at ¶ 41). King also shared with Freeman "her concerns regarding the potential reverse discrimination actions other medically unqualified fire fighters might take who were never afforded the opportunity to work for the [] County once they were deemed to be medically unqualified." (Id.). This disclosure of her public safety and civil liability concerns was not part of King's ordinary job duties. (Id.).

Allegedly in retaliation for King's disclosure and refusal to certify Mr. J, the County put the occupational medicine medical director contract out for bidding. (Id. at ¶ 43). King submitted her proposal and attended an interview with the selection committee, which included Thomas. (Id. at ¶¶ 44, 47). During the interview, Thomas asked whether King would handle Mr. J's certification differently if she were able. (Id. at ¶ 47). Later, King was informed that the committee could not agree to make a recommendation for either

King or the other candidate. (Id. at ¶ 49). On March 24, 2016, the County's "procurement director formally rejected all proposals for the occupational health program." (Id. at ¶ 51). However, when King later spoke with two members of the selection committee, they informed King that the committee had voted to give her the contract. (Id. at ¶¶ 54-57).

> The gravamen of King's claims is that the
>
> County used the [bidding] process to wrongfully terminate [] King because she had refused to provide medical clearance which would have permitted [Baker-Buford] to continue to hire and have [the] County employ a medically unqualified applicant, because she discussed and reported safety concerns with [the] County's management, and because she refused to medically qualify [Mr.] J, who is African-American.

(Id. at ¶ 59).

On September 15, 2016, King and OHC filed their Complaint against the Board of County Commissioners for Polk County, as well as Freeman, Baker-Buford, and Thomas in their individual capacities, alleging that they violated her First Amendment rights and Florida's Whistleblower Act for public employees, Section 112.3187, Fla. Stat., by retaliating against her for reporting her public safety concerns. (Doc. # 1). After Defendants moved to dismiss, King and OHC filed an Amended Complaint on November 4, 2016. The Amended Complaint contained four counts: (I) Florida whistleblower retaliation claim

against the County by King; (II) Florida whistleblower retaliation claim against the County by OHC; (III) First Amendment retaliation claim, brought under 42 U.S.C. § 1983, against the individual Defendants by King; and (IV) a § 1983 First Amendment retaliation claim against the County by King. (Doc. # 23). On December 22, 2016, the Court granted in part and denied in part Defendants' Motions to Dismiss and dismissed the two First Amendment retaliation claims without prejudice, after finding that King spoke as an employee rather than a citizen. (Doc. # 42).

Then, on January 23, 2017, King filed her Second Amended Complaint, with the same four counts but with WLM added as a plaintiff. (Doc. # 43). Defendants then filed another round of motions to dismiss, (Doc. ## 48-51), which also embed motions to strike King's prayer for punitive damages against the individual Defendants. King responded to the pending Motions on March 6, 2017. (Doc. ## 56-57). The Motions are ripe for review.

## II.   Legal Standard

### A.   Rule 12(b)(6)

On a motion to dismiss, this Court accepts as true all the allegations in the complaint and construes them in the light most favorable to the plaintiff. _Jackson v. Bellsouth_

9

Telecomms., 372 F.3d 1250, 1262 (11th Cir. 2004). Further, this Court favors the plaintiff with all reasonable inferences from the allegations in the complaint. Stephens v. Dep't of Health & Human Servs., 901 F.2d 1571, 1573 (11th Cir. 1990)("On a motion to dismiss, the facts stated in [the] complaint and all reasonable inferences therefrom are taken as true."). However,

> [w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level.

Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)(internal citations omitted). Courts are not "bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986). Furthermore, "[t]he scope of review must be limited to the four corners of the complaint." St. George v. Pinellas Cty., 285 F.3d 1334, 1337 (11th Cir. 2002).

### B.   Rule 12(f)

Rule 12(f) of the Federal Rules of Civil Procedure provides:

> The court may strike from a pleading an insufficient defense or any redundant, immaterial, or scandalous matter. The court may act:
>
> (1)   on its own; or
>
> (2)   on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading.

Fed. R. Civ. P. 12(f) (emphasis added).

Motions to strike are considered "drastic" and are disfavored by the courts. Thompson v. Kindred Nursing Ctrs. E., LLC, 211 F. Supp. 2d 1345, 1348 (M.D. Fla. 2002). Generally, "a court will not exercise its discretion under the rule to strike a pleading unless the matter sought to be omitted has no possible relationship to the controversy, may confuse the issues, or otherwise prejudice a party." Reyher v. Trans World Airlines, Inc., 881 F. Supp. 574, 576 (M.D. Fla. 1995).

## III.  Analysis

### A.    Protected Speech

Both of King's First Amendment claims, Counts III and IV, are governed by a four-stage analysis to determine whether King's speech is protected. Moss v. City of Pembroke Pines, 782 F.3d 613, 617 (11th Cir. 2015)(citing Carter v. City of Melbourne, Fla., 731 F.3d 1161, 1168 (11th Cir. 2013)). The first step is for the Court to "consider whether [King's]

11

speech was made as a citizen and whether it implicated 'a matter of public concern.'" Id. (quoting Rankin v. McPherson, 483 U.S. 378, 384 (1987)). These first two questions are "questions of law that are decided by the Court." Id. at 618 (citing Battle v. Bd. of Regents for Ga., 468 F.3d 755, 760 (11th Cir. 2006)). Only if this threshold requirement is met will the Court "then weigh [King's] First Amendment interests against the City's interest in regulating [her] speech to promote 'the efficiency of the public services it performs through its employees.'" Id. at 618 (quoting Rankin, 483 U.S. at 384).

All Defendants argue that King did not speak as a citizen on a matter of public concern. The determination of whether an employee spoke as a citizen concerns whether the speech "owes its existence to a public employee's professional responsibilities." Garcetti v. Ceballos, 547 U.S. 410, 421-22 (2006). However, the phrase "owes its existence to . . . must be read narrowly to encompass speech that an employee made in accordance with *or in furtherance of* the ordinary responsibilities of her employment, not merely speech that concerns the ordinary responsibilities of her employment." Alves v. Bd. of Regents of the Univ. Sys. of Ga., 804 F.3d 1149, 1162 (11th Cir. 2015)(emphasis added).

Thus, "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee — rather than citizen — speech." Lane v. Franks, 134 S. Ct. 2369, 2379 (2014). Instead, the Court considers relevant practical factors including "the employee's job description, whether the speech occurred at the workplace, and whether the speech concerned the subject matter of the employee's job." Alves, 804 F.3d at 1161. However, these factors are not dispositive. Id. An employee's job duties are interpreted practically because courts recognize that "[f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform." Garcetti, 547 U.S. at 424-25.

King argues that her conversation with Freeman was not employee speech. (Doc. # 56 at ¶ 13). The Second Amended Complaint adds some new allegations regarding that conversation. Specifically, King now alleges that she told Freeman "her concerns regarding the potential reverse discrimination actions other medically unqualified fire fighters might take who were never afforded the opportunity to work for the [] County once they were deemed to be medically unqualified." (Doc. # 43 at ¶ 41). According to King, the possibility of reverse discrimination lawsuits "would have

been a matter of public concern to the citizens in Polk County." (Id.). King also adds that "She advised Freeman of multiple instances where [Mr.] J, as an employee of [the County], falsified medical documents yet [Mr.] J was permitted to remain on the County payroll." (Id.).

Although King alleges that she had concerns for the public's safety and the possibility of reverse discrimination suits against the County, King made all of her disclosures to her employer rather than the public. See Alves, 804 F.3d at 1161 (noting that whether speech occurred in the workplace is relevant but not dispositive). As in the Amended Complaint, King does not allege that she contacted the media, or spoke out about the implementation of firefighter fitness requirements at a city council meeting, or made her concerns public in any other way. Cf. Boyce v. Andrew, 510 F.3d 1333 (11th Cir. 2007)(finding caseworkers spoke as employees and noting that one employee's "complaints, although more often in a written format as a letter or memorandum to a supervisor, were not sent to an outside entity").

King's complaints about the breach of procedures concerning Mr. J, which the Court discussed in its Order dismissing the Amended Complaint, were made so that she could fulfill her duties as occupational medicine medical director

14

by correcting what King considered improper conduct by Baker-Buford. Thus, those complaints were made in furtherance of her ordinary job responsibilities. See Alves, 804 F.3d at 1164-65 ("Each complaint in the Memorandum was made in furtherance of [plaintiffs'] ability to fulfill their duties with the goal of correcting Dr. Lee-Barber's alleged mismanagement, which interfered with [plaintiffs'] ability to perform."); see also Winder v. Erste, 566 F.3d 209, 215 (D.C. Cir. 2009)("[Employee's speech] was an attempt to ensure proper implementation of [his duties] and was therefore offered pursuant to his job duties."). Accordingly, the Court again finds that "in reporting conduct that interfered with [her] ordinary job duties, [King] spoke pursuant to those duties." Alves, 804 F.3d at 1165. The allegations that were previously included in the Amended Complaint about Baker-Buford's interference with King's medical determinations fail to qualify as citizen speech. While King insists in her response that Alves was wrongly decided, Alves is binding precedent.

But, King now alleges that, in addition to her complaints about the interference in her job duties, she informed Freeman of her concern that the County would be exposed to liability

for reverse discrimination lawsuits because of its hiring of Mr. J and that Mr. J had falsified his medical records.

The Court disagrees with Defendants that when King mentioned potential reverse discrimination lawsuits, she "was simply expressing what she believed to be a potential consequence of not letting King do her job." (Doc. # 48 at 16). Rather, King plausibly alleges that she was concerned that the County was violating employment discrimination laws, and that taxpayer money could be lost in a lawsuit brought in part because the County hired Mr. J despite his medical unfitness. Furthermore, the filing of falsified records by a County employee is serious misconduct that calls into question that employee's integrity and ability to serve the community — important issues that plausibly fall outside the ordinary duties of occupational medicine medical director.

Next, the Court finds, and the Defendants did not specifically contest, that King's speech regarding the possibility of reverse discrimination lawsuits and the falsification of records by Mr. J touched on a matter of public concern. An employee's speech involves a matter of public concern if that speech can "be fairly considered as relating to any matter of political, social, or other concern to the community." Cook v. Gwinnett Cty. Sch. Dist., 414 F.3d

1313, 1319 (11th Cir. 2005)(quoting Connick v. Myers, 461 U.S. 138, 146 (1983)).

King casts her communications as exposing misconduct by various County employees, including Baker-Buford and Mr. J, which could result in the County's liability in Title VII lawsuits brought by other medically unqualified firefighter applicants. "Exposing governmental inefficiency and misconduct is a matter of considerable significance," and here, King was concerned that the misconduct could lead to additional liability for the County, thereby affecting its citizens. Garcetti, 547 U.S. at 425. At the motion to dismiss stage, where the Court must accept the allegations of the Second Amended Complaint as true, King has plausibly alleged that her speech touched on a matter of public concern and was motivated by such a concern.

The next step of the First Amendment analysis is the Pickering balancing test. See Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cty., 391 U.S. 563 (1968). "The Pickering test seeks to arrive at a balance between the employee's interest in commenting on matters of public concern and his employer's interest in efficiently providing public services." Moss, 782 F.3d at 621 (citing Leslie v. Hancock Cty. Bd. of Educ., 720 F.3d 1338, 1346 (11th Cir. 2013)).

"The 'manner, time, and place' of the challenged speech and 'the context' in which it arose are relevant to the Pickering balance." Id. (citation omitted).

King's interest in her speech plausibly outweighs the County's interest in efficient administration. See Bryson v. Waycross, 888 F.2d 1562, 1566 (11th Cir. 1989)("[A] core concern of the [F]irst [A]mendment is the protection of the 'whistle-blower' attempting to expose government corruption."); see also Smith v. Birmingham Water Works, No. CV 12-J-3493-S, 2013 WL 246018, at *5 (N.D. Ala. Jan. 23, 2013)("Rather than impeding the government's ability to perform efficiently, exposing corruption in government employees promotes efficient public service."). The Defendants have not included any arguments regarding this prong of the First Amendment analysis. At this stage of the proceedings, King has plausibly alleged a violation of her First Amendment rights.

### B. Causation

"If [her] speech is so protected, the third stage of the analysis requires [King] to show that it was a substantial motivating factor in [her] termination." Moss, 782 F.3d at 618 (citation omitted). "If [King] is able to make this showing, the burden shifts to the City to prove that it would

18

have terminated [King] even in the absence of [her] speech."
Id. However, "[b]ecause these final two issues, which address
the causal link between [King's] speech and [her] termination,
are questions of fact, a jury resolves them unless the
evidence is undisputed." Id.

Here, the parties dispute the role that each individual
Defendant played in the decision to put the occupational
medicine medical director contract out for bidding, and
subsequently to not select King for that contract — the
adverse employment action King allegedly suffered because of
her speech.  Still, the individual Defendants argue that King
has failed to allege sufficient causation between each
Defendant's actions and the adverse employment action.

For all three individual Defendants, King alleges that
her "protected activity was a substantial or motivating factor
in the adverse actions taken against her." (Doc. # 43 at ¶
79).  "Each of the [i]ndividual Defendants personally
participated in the adverse actions against [] King in
violation of her First Amendment rights." (Id. at ¶ 82).
Furthermore, "[e]ach of the [i]ndividual Defendants were a
main participant, a policymaker, and/or made decisions to act
adversely to [] King in her relationship with Defendant County
after she engaged in protected First Amendment activity."

(Id. at ¶ 83). According to King, the individual Defendants "were acting under color of state law . . . when they made the decisions and/or participated in the adverse actions against [] King." (Id. at ¶ 84).

King's theory of causation is that the "County used the [bidding] process to wrongfully terminate [] King . . . because she discussed and reported safety concerns with [the] County's management."(Id. at ¶ 59). King has alleged facts plausibly supporting that allegation: Thomas asked King during her interview for the contract renewal whether King would change the way she behaved during Mr. J's medical qualification process, if she had the chance, and other members of the selection committee told King that she had been chosen by the committee, yet County officials informed King that the committee had not selected anyone and King's contract would not be renewed. (Id. at ¶¶ 47, 54-57).

At the motion to dismiss stage, King has plausibly alleged that her speech regarding the irregularities of Mr. J's medical fitness examination and medical records, as well as the County's potential liability King foresaw as a result, caused the adverse employment action against her. Cf. Cruz v. Puerto Rico Power Auth., 878 F. Supp. 2d 316, 327 n.4 (D.P.R. 2012)(denying motion to dismiss First Amendment retaliation

claim and stating "With the limited facts presently before the Court, we find that Plaintiff's speech was a substantial or motivating factor in the actions against him.").

### C.   Qualified Immunity

Even if King's speech is protected by the First Amendment, the individual Defendants argue that they are entitled to qualified immunity because it was not clearly established that King's speech was protected. "[D]efendants assert the defense of qualified immunity in a Rule 12(b)(6) motion to dismiss, and they are entitled to qualified immunity at this stage in the proceedings if [the Second Amended Complaint] fails to allege the violation of a clearly established constitutional right." Williams v. Ala. State Univ., 102 F.3d 1179, 1182 (11th Cir. 1997)(citations omitted). Qualified immunity protects government officials performing discretionary functions from being sued in their individual capacities unless their conduct violates a clearly established statutory or constitutional right. Brannon v. Finkelstein, 754 F.3d 1269, 1278 (11th Cir. 2014).

In order to establish a defense of qualified immunity, a government official must first demonstrate that he or she was acting within his or her discretionary authority. See Dalrymple v. Reno, 334 F.3d 991, 995 (11th Cir. 2003). King

does not contest that the individual Defendants were acting within their discretionary authority. (Doc. # 57 at 4). And, the Court has already determined that some of King's statements are protected under the First Amendment. Thus, the Court's qualified immunity analysis focuses on whether King's right was clearly established.

To determine if a right is clearly established, courts in the Eleventh Circuit use "two methods to determine whether a reasonable official would understand that his conduct violates a constitutional right." Carollo v. Boria, 833 F.3d 1322, 1333 (11th Cir. 2016)(quoting Moore v. Pederson, 806 F.3d 1036, 1047 (11th Cir. 2015)). The first method asks whether "binding opinions from the United States Supreme Court, the Eleventh Circuit Court of Appeals, and the highest court in the state where the action is filed . . . gave [the defendant] fair warning that his treatment of [the plaintiff] was unconstitutional." Merricks v. Adkisson, 785 F.3d 553, 559 (11th Cir. 2015). The second method examines whether a public official's "'conduct lies so obviously at the very core of what [federal law] prohibits that the unlawfulness of the conduct was readily apparent to [the public official], notwithstanding the lack of fact-specific case law' on point." Moore, 806 F.3d at 1047 (quoting Fils v. City of Aventura,

647 F.3d 1272, 1291 (11th Cir. 2011)(internal quotation marks omitted)). The first method is the relevant one for this analysis because "it is not 'so obvious' that [Defendants] violated the First Amendment in light of the close merits question of whether" King spoke as an employee or as a citizen. Carollo, 833 F.3d at 1333.

But, for King's claims, "[t]he law is clearly established that an employer may not demote or discharge a public employee for engaging in protected speech." Travers v. Jones, 323 F.3d 1294, 1295 (11th Cir. 2003); see also Akins v. Fulton Cty., Ga., 420 F.3d 1293, 1308 (11th Cir. 2005)(holding that a defendant had "fair warning . . . that speech whose main thrust is to report bidding irregularities to a public official in a meeting requested for that purpose is protected by the First Amendment" (internal quotation marks omitted)). According to the Second Amended Complaint, King's conflicts with Baker-Buford began in November of 2014 and the County officially rejected King's bid for contract renewal in March of 2016. Thus, the retaliatory actions taken by the Defendants occurred after the Supreme Court's decisions in Garcetti and Lane. Both cases made clear that speech on a matter of public concern made by an employee in their capacity as a citizen is generally protected by the First Amendment, even if the

employee gained knowledge about the subject of her speech through her employment. See Lane, 134 S. Ct. at 2379 ("[T]he mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee — rather than citizen — speech. The critical question under Garcetti is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties.").

Defendants cite to Eleventh Circuit case law stating that "[b]ecause no bright-line standard puts the reasonable public employer on notice of a constitutional violation, the employer is entitled to immunity except in the extraordinary case where Pickering balancing would lead to the inevitable conclusion that the discharge of the employee was unlawful." Dartland v. Metro. Dade Cty., 866 F.2d 1321, 1323 (11th Cir. 1989)(reversing denial of summary judgment and finding county manager entitled to qualified immunity for First Amendment retaliation claim). True, the Eleventh Circuit has acknowledged that "a defendant will only rarely be on notice that his actions are unlawful because applying the Pickering balancing involves legal determinations that are intensely fact-specific and do not lend themselves to clear, bright-line rules." Brannon, 754 F.3d at 1278 (affirming grant of

24

qualified immunity at motion to dismiss stage but "on somewhat different grounds because we now have the benefit of discovery unavailable to the district court at the motion to dismiss stage")(citation and internal quotation marks omitted).

But, those cases involved the Pickering balancing aspect of the analysis while Defendants argue primarily that King spoke as an employee. See Carollo, 833 F.3d at 1334 (affirming denial of qualified immunity at motion to dismiss stage and stating "Our decisions applying Pickering's balancing test are irrelevant, however, because here appellants do not advance an argument that they had an adequate justification for terminating Carollo, only that Carollo spoke pursuant to his official job responsibilities."). Furthermore, both Dartland and Brannon were decided with the benefit of discovery, rather than on the basis of the complaints' allegations alone.

The authority cited by Defendants may have led them to believe at the time of their retaliatory conduct that they might be entitled to qualified immunity in a potential retaliation action. But, those opinions do not undermine the fair warning provided by Garcetti, Lane, and Eleventh Circuit precedent that terminating an employee in retaliation for speaking on a matter of public concern outside the scope of

her ordinary job responsibilities violates the First Amendment.

The Second Amended Complaint sufficiently alleges that the individual Defendants violated King's clearly established First Amendment rights when they refused to renew King's contract in retaliation for her protected speech. See Cunningham v. Sch. Bd. of Lake Cty., No. 5:15-cv-480-Oc-30PRL, 2016 WL 5106944, at *4 (M.D. Fla. Sept. 20, 2016)(denying motion to dismiss based on qualified immunity because "the Supreme Court and Eleventh Circuit have recognized public employees' clearly established right to speak on matters of public concern well before Cunningham's demotion"). Thus, Baker-Buford, Thomas, and Freeman are not entitled to qualified immunity at this stage. But, with the benefit of discovery, they may be able to establish that they are entitled to qualified immunity later in the proceedings.

### B.   **Municipal Liability**

King did not respond to the County's argument that King has failed to sufficiently plead municipal liability for Count IV. And, while King "incorporate[d] all arguments previously made in opposition to dismissal of [Plaintiffs'] Whistleblower Act claims contained" in the response to the motions to dismiss the Amended Complaint, King has overlooked

incorporating her arguments on municipal liability for the
First Amendment retaliation claim against the County from her
previous response. (Doc. # 56 at 2). But, given the preference
for deciding cases on the merits, the Court does not grant
the County's Motion as to this issue as unopposed. See In re
Worldwide Web Sys., Inc., 328 F.3d 1291, 1295 (11th Cir. 2003)
(noting in the default context that "there is a strong policy
of determining cases on their merits"). Rather, the Court
finds that the Second Amended Complaint's allegations
sufficiently state a claim for municipal liability.

The County's Motion argues that King has not sufficiently
stated a claim under any of the theories for liability set
forth in Monell v. Department of Social Services, 436 U.S.
658 (1978). (Doc. # 48 at 17). A plaintiff seeking to impose
liability on a governmental entity under § 1983 must identify
a "municipal 'policy or custom' that caused the plaintiff's
injury." Bd. of Cty. Comm'rs of Bryan Cty., Okla. v. Brown,
520 U.S. 397, 403 (1997). A plaintiff may also establish
liability pursuant to a municipal policy when "a deliberate
choice to follow a course of action is made from among various
alternatives by the official or officials responsible for
establishing final policy with respect to the subject matter

in question." <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 483 (1986).

King has sufficiently alleged that the decision not to renew her contract in retaliation for her speech was made by a County decision-maker with final policymaking authority. King alleges: "One or more of the Individual Defendants had final policymaking authority for [the] County, and were responsible for hiring, retaining, staffing, training, and supervising other employees of the [] County and, when necessary for investigating alleged wrongdoing by its employees." (Doc. # 43 at ¶ 99).

And, while the County contests that any of the individual Defendants had final policymaking authority, the Court must accept the allegations of the Second Amended Complaint as true at this stage. <u>See</u> <u>Booth v. Pasco Cty., Fla.</u>, No. 8:09-cv-02621-T-30TBM, 2010 WL 2757209, at *12 (M.D. Fla. July 13, 2010)("In regards to whether Director Lopinto and BC Ciccarello have final policymaking authority as Plaintiffs allege, at this stage, the Court must assume that the facts alleged in Plaintiff's Amended Complaint are true. Defendant's argument to the contrary is more appropriate for a motion for Summary Judgment."). The Seconded Amended Complaint quotes the County's website as saying that Freeman

"is responsible for the proper administration of all affairs of the [C]ounty . . . [, w]ith the exception of the county attorney's office, Freeman appoints and manages all of the [C]ounty's nearly 2,000 employees . . . and is responsible for proper administration of the Board of County Commissioners' adopted budget." (Doc. # 43 at ¶ 8). Such an allegation plausibly supports that Freeman, as county manager, had final policymaking authority with respect to decisions to renew — or not — contracts like King's.

Furthermore, King has alternatively alleged that at least one of the individual Defendants was delegated final authority regarding the decision not to renew King's contract. If the individual Defendants are not final policymakers, King alleges that "one or more nonetheless functioned as the final policymaker for [the] County in connection with the allegations herein, their decisions and actions having been rubber-stamped at all higher levels of authority." (Id.). "Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority." City of St. Louis v. Praprotnik, 485 U.S. 112, 124 (1988)(quoting Pembaur, 475 U.S. at 483).

Here, King has alleged that final authority was delegated to at least one of the individual Defendants, and has alleged facts indicating that some of the individual Defendants played major roles in the decision not to renew King's contract. She alleges that Thomas was on the selection committee and asked King a question about the medical certification of Mr. J during King's interview. (Doc. # 43 at ¶ 47). King also alleged that the selection committee had chosen to give her the contract, yet someone in the County decided not to renew her contract regardless — reasonably implying that the final decision was made by a policymaker rather than the selection committee. (Id. at ¶ 54-57).

It is plausible that the county manager, deputy county manager for support services and human services, or the County's human resources director either had final policymaking authority or had been delegated final authority to decide whether to renew employment contracts for independent contractors like King. Thus, the First Amendment retaliation claim against the County should not be dismissed.

C.   **Whistleblower Retaliation**

1.   **New Allegations**

Although the Court already held that Counts I and II of the Amended Complaint sufficiently stated claims under

Florida's Whistleblower Act, the County argues that Count I and II of the Second Amended Complaint should be dismissed because the new allegations in these Counts undermine King's claims. (Doc. # 48 at 3). The Court disagrees. The Second Amended Complaint still states claims under Florida's Whistleblower Act.

In order to state a claim under the Act, a plaintiff must allege that (1) he or she engaged in a statutorily protected activity; (2) he or she suffered an adverse employment action; and (3) there existed a causal connection between the two events. See Castro v. Sch. Bd. of Manatee Cty., Fla., 903 F. Supp. 2d 1290, 1302 (M.D. Fla. 2012).

A disclosure is protected if the information revealed includes "[a]ny violation or suspected violation of any federal, state, or local law, rule, or regulation committed by an employee or agent of an agency or independent contractor which creates and presents a substantial and specific danger to the public's health, safety, or welfare" or "[a]ny act or suspected act of gross mismanagement, malfeasance, [or] misfeasance . . . committed by an employee or agent of an agency or independent contractor." Fla. Stat. § 112.3187(5).

For disclosures concerning a local governmental entity like the County, "the information must be disclosed to a chief

executive officer" or "other appropriate local official." Fla. Stat. § 112.3187(6). Additionally, the disclosure of a violation or suspected violation must be made in a signed written complaint, if disclosed on the employee's own initiative or to the employee's "supervisory officials." Fla. Stat. § 112.3187(7). But if the disclosure is made pursuant to a "request[] to participate in an investigation, hearing, or other inquiry conducted by any agency or federal governmental entity," there is no writing requirement. Id. The Court is mindful that "[t]he public whistleblower statute is remedial, and courts should construe it broadly." Competelli v. City of Belleair Bluffs, 113 So. 3d 92, 94 (Fla. 2d DCA 2013).

As the Court held regarding the Amended Complaint, the Second Amended Complaint's allegations that Baker-Buford submitted the suspected false medical records for Mr. J and called to cancel Mr. J's appointment with the specialist physician while pretending to be Mr. J's attorney plausibly qualify as malfeasance, which is "the doing of an act which a person ought not do at all," or misfeasance, which is "the improper doing of an act which a person might lawfully do." Burden v. City of Opa Locka, No. 11-22018-CIV, 2012 WL 4764592, at *10 (S.D. Fla. Oct. 7, 2012)(citations omitted).

The new allegation that Mr. J "falsified medical documents yet [] was permitted to remain on the County payroll" would also qualify as malfeasance. See (Doc. # 43 at ¶ 41).

Like the Amended Complaint, the Second Amended Complaint alleges that Kushner requested King participate in an inquiry, during which she made a disclosure about Baker-Buford's conduct, and therefore a writing would not have been required. King claims that Kushner asked her to review Mr. J's medical records to determine whether they contained "falsified medical information." (Doc. # 43 at ¶ 20). This allegation — that the County's director of risk management contacted King to review records for signs of falsification — still suffices to establish at this juncture that King was asked to assist in an investigation of misconduct rather than asked to perform her ordinary duty of providing medical fitness evaluations. Thus, for this allegation, a writing would not be required.

Nevertheless, King alleges that she also sent an email, with an attached chart, to Kushner and Mulloney that detailed the conflict surrounding Mr. J's medical fitness qualifications. (Id. at ¶ 36); see also Scheirich v. Town of Hillsboro Beach, No. 07-61630-CIV, 2008  WL 186621, at *14 (S.D. Fla. Jan. 18, 2008)(stating "[t]hese alleged complaints in the form of a report, letter, and email messages meet the

33

writing requirement of § 112.3187(7)"). And, regarding the County's insistence that King has not pled that she reported to an appropriate local official, the Court again finds that King, OHC, and WLM have plausibly alleged that Kushner, as director of risk management for the County, and Mulloney, as employee health services clinic director for the County, were appropriate officials who had authority to investigate misconduct by County employees and to whom King could report her concerns. See Saunders v. Hunter, 980 F. Supp. 1236, 1246 (M.D. Fla. 1997)(denying motion to dismiss because "plaintiff allege[d] she reported the incidents not to a chief executive officer but to her supervisors who are appropriate local officials").

The County emphasizes that King refers to Kushner and Mulloney as "'local officials' under [section] 112.3187" rather than "appropriate local officials." (Doc. # 48 at 4). But, this allegation explicitly invokes the statutory section discussing "appropriate local officials" and is combined with King's assertion that Kushner and Mulloney were in positions "to correct the actions that [King] reported." See (Doc. # 43 at ¶ 36); see also Igwe v. City of Miami, 208 So. 3d 150, 154 (Fla. 3rd DCA 2016)("The phrase, 'other appropriate local official,' has been interpreted to mean 'an official or

official entity who is affiliated with the violating governmental entity and *has the authority to investigate*, police, manage, or *otherwise remedy the violation or act* by the violating governmental entity.'")(citation omitted) (emphasis added). Thus, at this stage, these allegations are sufficient to plead that Kushner and Mulloney were appropriate local officials.

The Second Amended Complaint, like the Amended Complaint, sufficiently states a claim under Florida's Whistleblower Act.

### 2.   **New Party and Relation Back**

Next, the County argues that WLM should be dismissed as a party to this action because King did not seek leave to add a new party. However, the time to add parties and amend pleadings, as set by the Court's Case Management and Scheduling Order, did not end until March 15, 2017. (Doc. # 28 at 1). Therefore, it was acceptable for the Second Amended Complaint, which was filed on January 23, 2017, to add WLM as a party.

The County also argues that, if WLM is not otherwise dismissed, its whistleblower claim should be dismissed as time-barred. (Doc. # 48 at 7-8). A claim under Florida's Whistleblower Act must be brought within 180 days of the

violation. Fla. Stat. § 112.3187(8). King alleges that the adverse employment action — the nonrenewal of her contract — took place on March 24, 2016, at the latest, when the County formally rejected King's proposal for the occupational health program. (Doc. # 43 at ¶ 51). King and OHC filed the original Complaint in this Court on September 15, 2016, which is 175 days after the alleged adverse employment action. (Doc. # 1). But, WLM was only added as a party on January 23, 2017—over 300 days after the adverse employment action. (Doc. # 43).

But, King persuasively responds that WLM's claim is not time-barred because it relates back to King and OHC's claims, which are not time-barred on the face of the Second Amended Complaint. (Doc. # 56 at 9-11). King insists that WLM's claim in the Second Amended Complaint satisfies the requirements of Federal Rule of Civil Procedure 15(c)(1)(C) and relates back to the whistleblower claims by King and OHC in the original Complaint. "Though [the relation back] rule technically references amendments that change the parties against whom claims are asserted, [the Eleventh Circuit has] previously applied it to situations in which new plaintiffs were added." Makro Capital of Am., Inc. v. UBS AG, 543 F.3d 1254, 1259 (11th Cir. 2008)(citing Cliff v. Payco Gen. Am. Credits, Inc., 363 F.3d 1113, 1131-33 (11th Cir. 2004)).

"Federal Rule of Civil Procedure 15(c) governs when an amended complaint may 'relate back' to an earlier complaint, and therefore be considered filed at the time of the initial complaint." Lindley v. City of Birmingham, Ala., 515 F. App'x 813, 815 (11th Cir. 2013). An amended complaint that adds a party or changes the name of a party relates back where (1) the claim "arose out of the same conduct, transaction or occurrence set out — or attempted to be set out — in the original pleading"; (2) the new party "received such notice of the action that it will not be prejudiced in defending on the merits"; (3) the party being added received such notice within the time period of Rule 4(m), 90 days; and (4) the party being added "knew or should have known [within the Rule 4(m) time period] that the action would have been brought against it, but for a mistake concerning the proper party's identity." Fed. R. Civ. P. 15(c)(1)(B), (C)(i-ii); see Fed. R. Civ. P. 4(m).

Here, the allegations regarding King and OHC are the same as those involving WLM. WLM is merely a different entity through which King contracted with the County to provide medical services. King alleges that she was "both an owner and employee" of WLM, just as King has alleged that she is an owner and employee of OHC since the original Complaint. (Doc.

37

# 43 at ¶ 12). Whereas King previously alleged that she provided medical fitness examinations and drug screenings for County employees through OHC, (Doc. # 1 at ¶ 11; Doc. # 23 at ¶¶ 11-12), King clarifies that she actually provided the drug screenings through WLM. (Doc. # 43 at ¶ 6).

WLM, which is "wholly owned and operated" by King, was certainly on notice of the possibility of its being a party in this case when King and OHC filed the original Complaint. (Doc. # 43 at ¶ 6). And, as King's claims always involved allegations that the County refused to renew its contract with her and an entity through which she provided medical services, the County was on notice that King's claim would involve all entities, including WLM, through which King contracted to provide various medical services. Therefore, at this stage, the Court finds that WLM's claim in the Second Amended Complaint properly relates back to the previous complaints. As the Court previously found that King and OHC's claims were not time-barred on the face of the Amended Complaint, WLM's claim is also not time-barred on the face of the Second Amended Complaint and will not be dismissed on that basis.

### 3.   __Corporate Plaintiffs__

Even if it was proper to add WLM, the County argues that WLM and OHC should be dismissed because corporations are not "persons" under the Florida Whistleblower Act. (Doc. # 48 at 7). Under the Act, "employee" is defined as "a person who performs services for, and under the control and direction of, or contracts with, an agency or independent contractor for wages or other remuneration." Fla. Stat. § 112.3187(3)(b). Nothing in these definitions excludes a corporation from being a "person," and thus an "employee."

Section 1.01, Fla. Stat., which provides the general definitions for all Florida Statutes, states: "In construing these statutes and each and every word, phrase, or part hereof, where the context will permit: . . . (3) The word 'person' includes individuals, children, firms, associations, joint adventures, partnerships, estates, trusts, business trusts, syndicates, fiduciaries, corporations, and all other groups or combinations." Fla. Stat. § 1.01(3).

As the general definition of "person" under Florida law includes corporate entities like OHC and WLM, and the County has not presented any authority to suggest that the definition of "employee" in Florida's Whistleblower Act otherwise

excludes corporations, the Court will not dismiss OHC and WLM's claims.

### D.   <u>Punitive Damages</u>

Each Defendant includes a "Motion to Strike Prayer for Punitive Damages" at the end of his or her Motion to Dismiss, requesting that the prayer for punitive damages against the individual Defendants be stricken. However, Defendants do not cite to any legal authority for the proposition that the prayer for punitive damages should be dismissed. <u>See</u> Local Rule 3.01(a), M.D. Fla. ("In a motion or other application for an order, the movant shall include a concise statement of the precise relief requested, a statement of the basis for the request, and *a memorandum of legal authority in support of the request* . . ." (emphasis added)). Instead, Defendants argue that the "prayer for punitive damages should be stricken as conclusory and unsupported by the facts alleged in the [S]econd [A]mended [C]omplaint." (Doc. # 49 at 19).

While the Local Rules for the Middle District of Florida do not require defendants to confer with opposing counsel before filing motions to dismiss, they are required to confer before filing most other types of motions, including motions to strike. <u>See</u> Local Rule 3.01(g), M.D. Fla. But, Defendants have not included a certificate indicating that they have

40

conferred with King's counsel regarding the relief requested in the Motions to Strike embedded in their Motions to Dismiss. Denial of the Motions to Strike for violating Local Rules 3.01(a) and (g) alone is warranted.

Regardless, King's allegations that the County chose to put her contract out to bid and then refused to renew her contract despite the selection committee's vote for King create the plausible inference that the County acted with callous and willful disregard for King's constitutional rights. Cf. Bailey v. Town of Lady Lake, Fla., No. 5:05-cv-464-Oc-10GRJ, 2007 WL 677995, at *3 (M.D. Fla. Mar. 5, 2007)(declining to strike prayer for punitive damages at motion to dismiss stage because the complaint sufficiently "put the Individual Defendants on notice that Bailey is seeking punitive damages based on the Individual Defendants' 'intentional and willful' conduct"). Thus, the Court declines to strike King's prayer for punitive damages.

## IV.   **Conclusion**

King has sufficiently pled claims for First Amendment retaliation and violations of Florida's Whistleblower Act. Additionally, King has sufficiently pled her claim for punitive damages against the individual Defendants.

Therefore, Defendants' Motions to Dismiss and Strike are denied.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

Defendants' Motions to Dismiss (Doc. ## 48-51) are **DENIED.** Defendants' Motions to Strike Prayer for Punitive Damages (Doc. ## 48-51) are **DENIED.**

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 23rd day of March, 2017.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE