UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

NANCY KING, THE OCCUPATIONAL
HEALTH CENTER, INC., and
WORK LOSS MANAGEMENT, INC.,

      Plaintiffs,

v.                       Case No. 8:16-cv-2651-T-33TBM

BOARD OF COUNTY COMMISSIONERS,
POLK COUNTY, FLORIDA, KANDIS
BAKER-BUFORD, individually,
LEA ANN THOMAS, individually,
and JIM FREEMAN, individually,

      Defendants.
_____/

**ORDER**

This matter comes before the Court pursuant to Defendants Board of County Commissioners, Polk County, Florida's Motion for Summary Judgment (Doc. # 106), Jim Freeman's Motion for Summary Judgment (Doc. # 103), Kandis Baker-Buford's Motion for Summary Judgment (Doc. # 105), and Lea Ann Thomas's Motion for Summary Judgment (Doc. # 104). Plaintiffs Dr. Nancy King, the Occupational Health Center, Inc., and Work Loss Management, Inc., filed responses on November 6 and 7, 2017. (Doc. ## 117-119, 122). Defendants replied on November 20, 2017. (Doc. ## 130-133). For the

1

reasons that follow, the Motions are granted to the extent judgment is entered for Defendants on the First Amendment retaliation claims and the remaining state law claims are dismissed without prejudice.

## I.  **Background**

### A.  **The Saga of Mr. J**

The facts are these. King worked as the occupational health director for Polk County, Florida, from October 2000, to March 31, 2016. (King Aff. Doc. # 116-4 at ¶¶ 3, 67). Plaintiff entities, The Occupational Health Center, Inc., and Work Loss Management, Inc., are two companies owned and operated by King, with drug testing done through Work Loss Management and physicals done through Occupational Health Center. (King Dep. Doc. # 100 at 7:7-19, 16:4-14). Although these entities provided, and were paid for, services to the County, the contract at issue was between only King and the County. (Id. at 21:9-22:5; Craig Aff. Doc. # 112 at 11, ¶ 6).

As the occupational health director, King, among other things, "was tasked with examining both applicants and incumbents of Fire Rescue Services and rendering an opinion as to whether these individuals were medically qualified or not medically qualified to perform the essential functions of their positions." (King Aff. Doc. # 116-4 at ¶ 5). In making

these determinations, King utilized the "nationally recognized medical standard known as NFPA [] 1582," which "provides information for physicians and other health care providers responsible for fire department occupational medical programs." (Id. at ¶¶ 5-6). Although a Florida Statute mentions NFPA 1582 as a standard that may be used in determining whether a firefighter is physically fit, it is not required and the County never formally adopted NFPA 1582 as a mandatory requirement. (Id.; Freeman Dep. Doc. # 85 at 71:15-72:23).

King would provide her recommendation to one of two employees of the County's Risk Management Department, the director Mike Kushner or the Employee Health Services clinic's manager Diane Mulloney. (King Dep. Doc. # 100 at 20:16-25, 24:4-25:20). After King made her recommendation, Risk Management passed it along to HR and the County then decided whether or not to hire the applicant. (Id. at 24:11-25:3). The County was free to reject King's recommendation and hire an applicant, even if King did not recommend the applicant as medically cleared. (Id. at 112:18-113:7).

King and her employees were not the only ones working in the County's Employee Health Services clinic. Wellness services for County employees, such as treatment for colds or

other acute illnesses, were provided by Dr. Aguilera and his staff, including nurses and physician assistants. (Aguilera Dep. Doc. # 84 at 8:14-9:18). But Dr. Aguilera or the nurses at the Employee Health Services clinic also performed some of the pre-employment physicals. (Id. at 12:1-15; Mulloney Dep. Doc. # 96 at 23:10-24:4).

In December of 2013, a physician assistant employed by King, Kelly Manion, performed a pre-employment fitness exam on a man who was about to begin training to be a Polk County firefighter — a man whom the Court will refer to as Mr. J. During that examination, Manion noticed that Mr. J, who is African-American, "had a very abnormal pulmonary function test" and an abnormal chest X-ray of his lungs, which prevented her from completing the examination. (Manion Dep. Doc. # 91 at 26:9-28:12).

Instead, Manion informed Mr. J and entered into her notes that "Candidate will need medical clearance from his personal physician and in the interim is not medically qualified for entrance into the firefighter academy." (Id. at 28:13-31:17, 74). Mr. J would be expected to send the results of the further testing with his personal physician back to Employee Health Services so that King could make the final pre-employment clearance determination. (Id. at 29:12-30:7). But,

Mr. J was under the impression that he only needed to get clearance from his personal physician or a pulmonologist. (Mr. J Dep. Doc. # 92 at 143:18-146:7).

In late December of 2013 or early January of 2014, Baker-Buford, the Equal Opportunity Administrator who subsequently became Human Resources Director, called Mulloney and asked whether Risk Management would permit Mr. J to begin classroom training pending final medical clearance. (Mulloney Dep. Doc. # 96 at 45:2-47:7, 113-14). Mulloney gave permission for Mr. J to begin classroom training, and discussed having Mr. J sign a letter acknowledging that he must be medically cleared before he could be hired as a firefighter. (Id.). Although she testified that other employees have been provisionally hired pending medical clearance in the past, Mulloney did not realize that Mr. J would become a County employee by attending classroom training. (Id. at 47:6-49:7). Regardless, in the County's eyes, Mr. J became a County employee when he was cleared by Risk Management to participate in classroom training. (Freeman Dep. Doc. # 85 at 47:12-18).

Apparently, the confusion about Mr. J's pre-employment clearance arose because Mr. J participated in a special County diversity program, the Proactive Diversity Recruitment and Training Program (PDRTP), which put firefighter and EMT

trainees on the County's payroll. (Baker-Buford Aff. Doc. #
109 at ¶¶ 10, 16-17). Ordinarily, trainees are not employees
— only after a trainee successfully completes the firefighter
or EMT training program is he hired by the County. (Id. at ¶
16). Because trainees are not usually employees, they
ordinarily do not need to complete the County's pre-
employment fitness exam before beginning their training.

The diversity program changed this dynamic for its six
yearly participants because it sought to increase the number
of diverse firefighters and EMTs in Polk County. (Baker-
Buford Aff. Doc. # 109 at ¶ 12; Mathis Aff. Doc. # 111 at ¶¶
5-6, 10). In this context, "diverse" had a wide definition —
anyone, regardless of gender or race, was eligible for the
program so long as they have resided in Polk County for at
least six months and are "economically disadvantaged, as
defined by the HUD guidelines." (Baker-Buford Aff. Doc. # 109
at ¶ 12). The program's solution was to hire the selected
applicants as County employees for the entirety of their
training, and have the County cover the training expenses.
(Id. at ¶¶ 15-16). The Equal Opportunity Center (EOC), within
the Equity and Human Resources Department, was in charge of
recruiting and hiring the diversity program participants,
whereas Risk Management, under which Employee Health Services

fell, was the department involved in providing medical clearance for new employees to HR before they were hired. (Id. at ¶¶ 3, 6, 9, 16; Mulloney Dep. Doc. # 96 at 15:17-18:7).

Pursuant to her conversation with Mulloney, Baker-Buford wrote Mr. J a letter, which she had Mr. J sign on January 10, 2014. (Mr. J Dep. Doc. # 92 at 97; Baker-Buford Aff. Doc. # 109 at ¶ 17). The letter stated that Mr. J had to meet the requirements imposed by Employee Health Services and that his "continued employment is based on a successful medical clearance." (Mr. J Dep. Doc. # 92 at 97). Later, on April 18, 2014, Baker-Buford called Mulloney and informed her that Baker-Buford had given Mr. J a May 1, 2014, deadline to get medical clearance. (Id. at 101; Mulloney Dep. Doc. # 96 at 52:19-53:11, 115).

In April of 2014, Mr. J went to a pulmonologist, Dr. Shah. (Manion Dep. Doc. # 91 at 79). On April 23, 2014, Dr. Shah wrote a letter stating that he was treating Mr. J for a rare type of pneumonia and stated that Mr. J was "cleared to join Polk County fire [rescue], with the limitations that he may not do any major physical activity." (Manion Dep. Doc. # 91 at 79). Dr. Shah further stated that Mr. J would "be re-evaluated in 2-3 months to reassess his condition." (Id.).

For whatever reason, King was not provided a copy of this clearance and would not become involved in reviewing Mr. J's records for months to come. (King Dep. Doc. # 100 at 38:7-39:11). Dr. Aguilera, however, was provided the letter and determined that Mr. J was not medically qualified to be a firefighter on April 29, 2014. (Mulloney Dep. Doc. # 96 at 116).

On May 14, 2014, a nurse practitioner, Nurse Albano, wrote a letter stating that Mr. J was under her care and was "cleared to attend EMT classes and ride [alongs]" but would need clearance from a pulmonologist for physical training or exercises. (Manion Dep. Doc. # 91 at 80). A few days later, on May 20, 2014, Nurse Albano wrote a letter "releas[ing] [Mr. J] to perform all duties as an EMT trainee." (Id. at 81). Someone from the EOC office sent Nurse Albano's letter to Mulloney at the Employee Health Services clinic. (King Dep. Doc. # 100 at 277). Still, Mulloney did not recall receiving this clearance letter. (Mulloney Dep. Doc. # 96 at 57:23-58:18). A few days later, on June 3, 2014, Nurse Albano wrote a letter clarifying that a pulmonologist must clear Mr. J for physical training. (Id. at 122; Albano Dep. Doc. # 88 at 33:11-35:11).

Mr. J then went to see another pulmonologist, Dr. Ackerman, in August of 2014. Dr. Ackerman stated that Mr. J was "cleared for work (firefighter school) but will have another [pulmonary function test] and ct [scan] done in 3 [months]." (King Dep. Doc. # 100 at 280). After Dr. Ackerman's findings, on October 14, 2014, Nurse Albano filled out an official form titled "Medical Examination to Determine Fitness for Firefighter Training, Bureau of Fire Standards and Training," giving Mr. J full clearance to engage in firefighter training. (Albano Dep. Doc. # 88 at 37:1-40:23, 132). But someone from the Employee Health Services clinic contacted Nurse Albano and, on November 18, 2014, Nurse Albano rescinded the clearance she had given Mr. J the previous month. (Mulloney Dep. Doc. # 96 at 62:18-67:9, 134).

Meanwhile, Mr. J had continued his treatment with Dr. Ackerman. And Dr. Ackerman, after monitoring Mr. J's condition and performing additional tests, issued another clearance for Mr. J on November 24, 2014. (King Dep. Doc. # 100 at 286; Mulloney Dep. Doc. # 96 at 130). That letter states: "After the physical evaluation of [Mr.] J's health and reviewing the job description for Firefighter, [Mr.] J is released to perform all duties as a Firefighter." (Id.). As Dr. Ackerman continued treating Mr. J, he sent further letters

clearing Mr. J in February and March of 2015. (Mulloney Dep. Doc. # 96 at 137, 139).

Also in November of 2014, the then-director of Risk Management, Mike Kushner, became involved after Mulloney explained Mr. J's situation to him. (Mulloney Dep. Doc. # 96 at 69:19-25). He emailed Mulloney and King asking them to prepare "a detailed chronology with medical records and notes of [their] conversations with HR" and stating that he needed "to discuss the pre placement physical examination process with [Baker-Buford]." (King. Dep. Doc. # 100 at 309). Kushner emphasized that Employee Health Services should maintain control throughout the medical clearance process. (Id.; Kushner Dep. Doc. # 89 at 17:6-19:9). He insisted that candidates for employment should send their medical records directly to Employee Health Services, rather than to the EOC, and that HR should not hire a candidate until medical clearance is received from Employee Health. (King. Dep. Doc. # 100 at 309).

Kushner asked King to make a fitness for duty determination for Mr. J based on his records but King explained that she needed to see him personally to make that determination. (King Dep. Doc. # 100 at 338). On November 14, 2014, King called Baker-Buford to notify her that King would

be performing a fitness for duty evaluation for Mr. J. (Id.). Baker-Buford refused, stating that "it would be inappropriate for [King] to see Mr. J as he had already received medical clearance from his treating physician and that he would not be [undergoing] any further evaluation by [King]." (Id.). King was "dumbfounded" by Baker-Buford's refusal because "[i]n fifteen years, the County had never prevented [King] from performing [her] job responsibilities." (King Aff. Doc. # 116-4 at ¶ 15).

After that, in a December 1, 2014 email, Kushner asked King to "review the medical records regarding Mr. J and render an opinion on whether or not he may perform the duties of a firefighter" and to provide her "medical opinion as to whether Mr. J completed his physical intake questionnaire accurately given the medical history he provided" to other providers. (King Dep. Doc. # 100 at 310). King had never before been "asked to review an applicant's medical records for potentially false information." (King Aff. Doc. # 116-4 at ¶ 16). Still, King acknowledged that she needed to have "a comfort level" with the accuracy of an applicant's medical history to make her fitness for duty determinations and that an inaccurate history is "certainly something [she] take[s] into consideration." (King Dep. Doc. # 100 at 129:24-130:9).

King also stated that, if she discovered inconsistencies or falsification of medical records while making a fitness for duty determination for another applicant, she "would certainly notify the employer." (Id. at 130:18-25).

On December 10, 2014, King completed her records review and told Kushner that a different occupational health specialist or pulmonologist should give a second opinion, "given the contentious nature of this case." (King Dep. Doc. # 100 at 338). King noted "multiple inconsistencies reported to various medical providers by [Mr.] J, specifically false information regarding past pulmonary conditions." (King Aff. Doc. # 116-4 at ¶ 18).

Kushner then told Baker-Buford that he wanted a second opinion from another pulmonologist, Dr. McCluskey, about Mr. J. (King Dep. Doc. # 100 at 291). Baker-Buford wrote back that she was "fine with it, if [the County had] done so with other employees" but was concerned because Mr. J had already gone to a pulmonologist and been cleared, so the County "shouldn't keep making him jump through hoops." (Id.). After the appointment with Dr. McCluskey was scheduled by Risk Management, Baker-Buford emailed Mulloney asking to reschedule the appointment so that Mr. J would not have to miss class, as trainees are only allowed to miss three days

of class total. (King Aff. Doc. # 116-4 at ¶ 27; Baker-Buford Aff. Doc. # 109 at ¶ 19). The appointment was rescheduled for February 6. (Baker-Buford Aff. Doc. # 109 at ¶ 19).

In February of 2015, County Manager Freeman and Deputy County Manager Thomas had a meeting with Kushner and Baker-Buford about the confusion regarding the medical clearance process raised by Mr. J's situation. (Freeman Aff. Doc. # 107 at ¶ 8). Freeman learned that Mr. J had been an employee for over a year, had medical clearance to enter the EMT training program, and had some clearances from outside medical providers, but had never been cleared by King. (Id.). Kushner and Baker-Buford explained their disagreement about the medical clearance process — i.e. whether an outside specialist's clearance is sufficient and whether an individual should be able to choose which specialist he sees if King decided a second opinion was needed. (Id.; Freeman Dep. Doc. # 85 at 88:4-91:13; Kushner Dep. Doc. # 89 at 18:8-20:3). Freeman was frustrated that the issue was being brought to him a year later and "directed [Kushner] and [Baker-Buford] to work together and propose a better practice for both of their departments to follow, so that this situation would not repeat itself." (Freeman Aff. Doc. # 107 at ¶ 8; Freeman Dep. Doc. # 85 at 89:11-90:14).

Kushner and Baker-Buford continued to disagree over whether an outside physician or specialist's fitness determination was sufficient to medically clear a candidate for employment. In a March 2, 2015 email, Kushner emphasized that King had discretion in choosing the specialist to which a candidate was referred for further testing, rather than letting the candidate choose from a panel of options. (King Dep. Doc. # 100 at 312). Even if the candidate's personal physician or the specialist to whom King referred him disagreed, Kushner insisted King or another examining physician for Employee Health Services should make the final "determin[ation] whether or not the candidate or employee may perform the essential functions of the job with or without restrictions." (Id.).

In response, Baker-Buford stated that she knew King did not currently give employees or job candidates a panel of three specialists to choose from, if King required a second opinion because of a disagreement with the candidate's personal physician or specialist. (King Aff. Doc. # 116-4 at 76). Rather, Baker-Buford asked Kushner to have King "implement [those] changes to the process," which Kushner did not do. (Id.). Furthermore, Baker-Buford told Kushner that "County Management" notified her that "once the employee is

cleared by his/her [personal care physician] or specialist, that is it" and the employee would not be seen by "any other physician at the County's expense," and the County would hire the applicant. (Id. at 76, ¶ 31). Kushner responded that he disagreed with the County "hir[ing] an employee based upon the recommendation of a personal physician rather than the county's assigned occupational medicine doctor" and that the County management was "making an error in judgment." (Id. at 75).

Around this time, in the middle of March, King was told by Dr. McCluskey that the February appointment with Mr. J had been cancelled by a woman who referred to Mr. J as "her client," leading Dr. McCluskey to believe Mr. J was represented by an attorney. (King Aff. Doc. # 116-4 at ¶ 39). With Risk Management's help, King did a public records search to determine who called Dr. McCluskey. (Id.). The search revealed that Dr. McCluskey had been called by Sharon Mathis's office phone — Mathis is an employee of Baker-Buford in the County's EOC. (Id.). King "[found] it very unusual that someone from the County would be calling on behalf of an employee to make determinations about whether or not he's going to be at an appointment or not" and another example of

the high involvement the EOC and HR departments had displayed in Mr. J's case. (King Dep. Doc. # 100 at 107:23-108:8).

As Mathis later explained to Freeman and testified in her deposition, she had not cancelled Mr. J's appointment at all, nor had she represented herself to Dr. McCluskey as Mr. J's attorney. (Mathis Aff. Doc. # 111 at ¶¶ 20-21; Freeman Aff. Doc. # 107 at ¶¶ 13-14). Rather, Mathis had called Mr. J to remind him of the appointment scheduled for the next day, but was told by Mr. J that he was in the hospital with food poisoning. (Mathis Aff. Doc. # 111 at ¶ 18). In order to give Mr. J a telephone number so he could rearrange the appointment, Mathis searched the internet for Dr. McCluskey's office number. (Id. at ¶¶ 19, 22). Apparently Dr. McCluskey had changed offices numerous times and different telephone numbers were listed for him. (Id. at ¶ 19). Mathis called various incorrect numbers for Dr. McCluskey's office, and, after eventually reaching Dr. McCluskey himself, told him only that she "was calling on behalf of Mr. J and was confirming Dr. McCluskey's number." (Id.). Freeman "concluded that [Mathis] had not represented herself as Mr. J's attorney and that the records corroborated her story." (Freeman Aff. Doc. # 107 at ¶ 14).

On March 12, 2015, just two days after Mr. J's pulmonologist Dr. Ackerman issued another clearance for Mr. J, King faxed Dr. Ackerman a letter "outlining [her] position with the [County] as well as [her] concerns regarding [Mr. J]" and "inform[ing] him of the NFPA 1582 medical guidelines for physicians evaluating firefighters." (King Dep. Doc. # 100 at 339). Dr. Ackerman called King that day, admitted that he was unaware of the NFPA 1582 guidelines, and "concurred immediately that Mr. J did not meet" those guidelines. (Id.). But Dr. Ackerman did not issue a revocation of his previous clearance at that time. The next day, King sent a certified letter to Mr. J "apprising him of [her] conversation with Dr. Ackerman and advising him that it was [her] medical determination that he was not qualified to perform the essential functions of the job of a firefighter." (Id.).

After her conversation with Dr. Ackerman, King emailed Baker-Buford to tell her about Dr. Ackerman's change in opinion and that Dr. Ackerman "would provide a final recommendation regarding [Mr. J]" soon. (Id. at 316). Baker-Buford responded that it was important for King to treat Mr. J the same as other employees and that the County should not subject him "to additional requirements or barriers." (Id.). Baker-Buford attached a copy of Dr. Ackerman's March 10, 2015

clearance letter — the last written opinion of Dr. Ackerman's on file. (Id.). King was "once again astonished" and "shocked" by Baker-Buford's conduct, specifically her possession of "an employee's medical records, circumventing the Employee Health Services" and her "question[ing] [King's] consistency of treatment and fairness when [Baker-Buford] herself had stepped outside the boundaries of her duties on multiple occasions." (King Aff. Doc. # 116-4 at ¶ 38). King "notified [] Kushner of [] Baker-Buford's email and [her] frustration with what [King] perceived was gross interference with [her] job responsibilities." (Id.).

On March 31, 2015, King had a meeting with Thomas. During the meeting, King communicated her public safety concerns regarding Mr. J potentially working as a firefighter, as well as her concern that "the County could face exposure for possible 'reverse' discrimination [lawsuits] given the favoritism afforded to [Mr.] J and [] Baker-Buford's unprecedented involvement in the medical clearance process." (Id. at ¶ 40). King "also reported to [] Thomas that Dr. McCluskey received a call from [] Mathis' desk during which the caller indicated that [Mr.] J was her client." (Id.).

Subsequently, King sent a follow-up letter to Dr. Ackerman on April 1, 2015, to which she attached an official

medical clearance form for Dr. Ackerman's signature. (King Dep. Doc. # 100 at 339). Dr. Ackerman signed the form the next day, noting that Mr. J was not medically qualified for firefighter training. (Id.; Mulloney Dep. Doc. # 96 at 141). King sent the form to Mulloney and had Mulloney forward it to the firefighter academy. (Mulloney Dep. Doc. # 96 at 142-143). Mr. J was dismissed from firefighter training on April 6, 2015, as a result. (King Aff. Doc. # 116-4 at ¶ 41).

Although he had been removed from firefighter training, King was asked her opinion "as to whether or not [Mr.] J could work as an EMT without firefighting responsibilities" on April 21, 2015. (King Aff. Doc. # 116-4 at ¶ 44). King determined that an outside physician, Dr. Gupta, should make that determination, given the contentiousness of the situation. (Id.). Mr. J had his appointment with Dr. Gupta on June 24, 2015. (Id. at ¶ 46). Based on Mr. J's results, Dr. Gupta recommended that Mr. J "complete a physical agility test with a pulse oximeter in place" before a final fitness determination be made. (Id.).

On June 25, 2015, King provided a letter to Kushner outlining her recommendation that Mr. J undergo the physical agility test again. (King Dep. Doc. # 100 at 324, 341). She also conveyed her "concerns regarding his credibility as a

patient and ability to provide a truthful account of his current medical condition and symptoms," based on additional inconsistencies with the medical history Mr. J reported to Dr. Gupta. (Id.). She wrote:

> If it is the determination of County officials that in spite of multiple self-reported medical history inconsistencies as well as untruthful information provided to . . . Dr. Gupta, they wish to continue with further testing, then it is my recommendation to proceed with the requirements set forth in Dr. Gupta's addendum.

(Id. at 324). She concluded that she was "unable to provide medical clearance without this additional testing, therefore, the patient continues to remain medically unqualified for this position pending successful completion of same." (Id.).

Shortly after issuing her letter, King was contacted by another Deputy County Manager, Gary Hester, who told her "that under no circumstances was the County going to require any additional testing of [Mr.] J" and that she "was putting the County at risk for a disability action by [Mr.] J." (Id. at 341; King Aff. Doc. # 116-4 at ¶ 49). King felt that Hester "was trying to intimidate [her]" and became hostile when she "refused to acquiesce." (King Aff. Doc. # 116-4 at ¶ 49).

Freeman ultimately decided to place Mr. J in a non-firefighter EMT position with the County. (Freeman Aff. Doc. # 107 at ¶ 10). At this time, Mr. J was already a state and

nationally certified EMT, and had "been medically cleared to enter the Polk State College EMT program." (Hester Aff. Doc. # 110 at ¶ 7; Freeman Aff. Doc. # 107 at ¶ 10). Hester had spoken with "the training academy director, who confirmed [] that Mr. J was fully capable of performing the job duties and requirements of an EMT, and that he had witnessed him successfully perform strenuous tasks during his fire training." (Hester Aff. Doc. # 110 at ¶ 7). Hester also related to Freeman that EMTs are never required to take the physical agility test with a pulse oximeter on their finger, as suggested by Dr. Gupta, and that such test likely could not even be taken while wearing a pulse oximeter. (Id. at ¶ 6; Freeman Aff. Doc. # 107 at ¶ 11). Hester and the County's labor attorney were also concerned about requiring Mr. J to retake the physical agility test because they "had never required any candidate to retake a test that had been previously passed." (Hester Aff. Doc. # 110 at ¶ 5).

According to Freeman, the irregularities with Mr. J's medical-clearance and records were not his sole concern in deciding whether Mr. J should work as an EMT. The County Attorney and County's outside labor lawyer had advised Freeman that Mr. J, as a County employee, was entitled to a reasonable accommodation under the Americans with

Disabilities Act. (Freeman Aff. Doc. # 107 at ¶¶ 9-12; King Dep. Doc. # 100 at 151:23-153:8). Essentially, although Mr. J had never been approved for employment by King, Mr. J had been an employee for almost a year and was owed all the privileges and protections enjoyed by other County employees, including reasonable accommodations. (Craig Aff. Doc. # 112 at ¶ 9). Freeman took King's medical opinion into account by removing Mr. J from firefighter training, and instead hiring him as an EMT. (Freeman Dep. Doc. # 85 at 53:6-25).

Later, King and Freeman had a meeting on September 11, 2015. (Freeman Aff. Doc. # 107 at ¶ 15). King described the purpose of the meeting as "to discuss the public safety concerns [she] had regarding Mr. J as well as [the] oddities of involvement" of Baker-Buford. (King Dep. Doc. # 100 at 341). In contrast, Freeman considered the meeting to be a "debriefing" of the events, as the decision had already been made months before to retain Mr. J in an EMT position. (Freeman Dep. Doc. # 85 at 66:18-67:4; Freeman Aff. Doc. # 107 at ¶ 15). During the meeting, King insisted that Mr. J was not qualified to be a firefighter or EMT, based on his test results and inconsistent medical history, and trumpeted the danger to public safety a medically unqualified firefighter or EMT would pose. (King Dep. Doc. # 100 at

149:13-21, 341). Although Freeman does not remember King bringing up the issue and King's personal notes taken contemporaneously do not mention this, King alleges she warned Freeman of the risk of "reverse discrimination" lawsuits by white firefighter trainees who had been medically disqualified. (Id. at 151:6-16, 341; Freeman Dep. Doc. # 85 at 73:13-23, 75:11-23).

During the meeting, Freeman told King: "We just needed your help on this, Dr. King." (Freeman Dep. Doc. # 85 at 69:22-70:7; King Aff. Doc. # 116-4 at ¶ 53). Freeman contends his statement "was not meant to imply anything other than what [he] was trying to accomplish" — that the County "needed help from all departments in improving communication, finding a suitable accommodation for that employee, and finding ways to make sure this situation does not reoccur." (Freeman Aff. Doc. # 107 at ¶ 16). Freeman states he was not frustrated because King disqualified Mr. J as a firefighter or EMT, but because he felt King's "participation should have been more constructive in understanding the situation and helping us medically find an accommodation instead of seeming to want to advocate for [Mr. J's] dismissal." (Freeman Dep. Doc. # 85 at 94:7-10, 52:14-53:1, 69:22-70:7, 98:3-99:25).

In response to Freeman's comment, King stated that she would not compromise her medical judgment. (King Dep. Doc. # 100 at 341). Freeman told King that he would never ask her to compromise her medical judgment and did not want her to do so. (Id.; Freeman Dep. Doc. # 85 at 70:8-21). The meeting then ended cordially. (King Dep. Doc. # 100 at 150:22-24).

### B.    Request For Proposals and King's Resignation

County Attorney Michael Craig explains in his affidavit that he "determined in 2013 that all contracts for county medical directors were not exempt from the County's procurement process." (Craig Aff. Doc. # 112 at ¶ 4). In accordance with this determination, a different contract — the contract for the County's emergency medical services director — was offered out through a Request for Proposals (RFP) in 2014. (Id.). Craig avers that, "[a]lthough [] King's contract did not go out for the competitive procurement process until it expired in 2015, the decision to do so was made in 2013" — long before King's involvement in the Mr. J matter. (Id.).

In an email chain, with the subject line "Nancy Davis King," from December of 2013, Mulloney and Kushner argued that King's contract would not need to be put out through an RFP because of a state statute exempting medical director

services from the competitive bidding process. (Id. at 5-6).
An attorney in the County Attorney's office responded that
the statute only applied to state agencies — not local
governments like the County — and medical services were not
exempt under the County procurement ordinance that controlled
the decision. (Id. at 5).

In September of 2015, at the direction of Thomas, Kushner
informed King that her contract would be put through the RFP
process, rather than being renewed as it had been before.
(King Dep. Doc. # 100 at 341; King Aff. Doc. # 116-4 at ¶
52). Kushner, who had disagreed with the County Attorney about
the necessity of the RFP process, told King that "County
Management was not happy with how [King] handled the [Mr.] J
situation." (King Aff. Doc. # 116-4 at ¶ 52; King Dep. Doc.
# 100 at 157:15-23). Kushner also asked King to continue
working past the September 30 expiration date of her contract
while the RFP process was ongoing, to which King agreed. (King
Aff. Doc. # 116-4 at ¶ 52).

Only two proposals were submitted through the RFP
process by King and the University of South Florida, which
also provided the County services for its indigent health
care program. (Thomas Dep. Doc. # 99 at 9:17-21; 33:3-9).
Thomas had earlier requested that Kushner reach out to the

medical director from USF to see if USF would be interested in submitting an RFP proposal. (King Aff. Doc. # 116-4 at ¶ 54; King Dep. Doc. # 100 at 178:2-15). Kushner testified that one of the reasons he was asked to contact USF was that the County "was looking to see if [they] could consolidate some of the job responsibilities" for the various medical director positions "to make it more efficient and less costly." (Kushner Dep. Doc. # 89 at 67:12-21; Thomas Dep. Doc. # 99 at 32:19-33:9).

In February of 2016, the selection committee met and held interviews with the two proposers. During King's interview, Thomas asked King a question related to Mr. J's situation that King considered inappropriate. Thomas asked: "Based upon recent difference of expectations with the County Manager's Office and that whole situation of care, what would you do differently or how would you handle that if we were starting in the beginning?" (King Aff. Doc. # 116-4 at ¶ 60; King Dep. Doc. # 100 at 180:20-181:9). King responded that she "would not have done anything different" and, in the future, would demand access to the County's labor attorney to discuss her concerns. (King Aff. Doc. # 116-4 at ¶ 61).

Despite the allegedly inappropriate question, every member of the selection committee, including Thomas, ranked

King's proposal higher than USF's. (Thomas Aff. Doc. # 113 at ¶ 13). In order for the proposal to move forward, the selection committee had to "collectively decide if they would like to recommend the Board [of County Commissioners] authorize staff to enter into Contract Negotiations with the highest-ranked Proposer." (King Dep. Doc. # 100 at 355). But the meeting minutes taken by the committee's facilitator, Tammy Winton-Spearman, state that the selection committee "collectively decided not to make a recommendation to the Board at this time." (Doc. # 102 at 139). Some members of the committee do not recall taking a vote on whether to recommend a proposal to the Board at all or assumed that King's proposal would be sent to the Board because it was ranked highest. (Fulse Dep. Doc. # 87 at 20:20-21:11; McMicken Dep. Doc. # 95 at 17:5-18:7; Page Dep. Doc. # 97 at 7:13-9:20).

Winton-Spearman testified that no official vote was taken, but that there was no consensus among the committee members that they were going to make any recommendation to the Board that day. (Winton-Spearman Dep. Doc. # 98 at 13:1-15, 28:2-25, 30:15-31:10). According to Winton-Spearman, Thomas stated that she was not ready to make a recommendation and the other committee members "chimed in." (Id. at 31:4-10, 32:11-17). Regardless, no committee member stated that

27

the committee had agreed to recommend King's proposal to the Board, but were overridden. Although King's proposal was not recommended to the Board at that meeting, it had not been rejected and the selection committee "could reconvene at a later time, if it chose to do so, because the RFP allowed the proposals to remain open and irrevocable for 90 days." (Thomas Aff. Doc. # 113 at ¶ 15; Winton-Spearman Dep. Doc. # 98 at 11:11-15, 20:12-24).

Winton-Spearman and Thomas stated that it was not unusual for selection committees not to immediately send a recommendation to the Board for the highest-ranked proposal. (Winton-Spearman Dep. Doc. # 98 at 21:23-25, 22:6-9; Thomas Aff. Doc. # 113 at ¶ 19). Another member of the selection committee, Lance Fulse, also stated that it was not surprising to him that King did not get the contract because he had been on other RFP committees in which the highest-ranking proposal was not ultimately awarded the contract. (Fulse Dep. Doc. # 87 at 15:7-25).

Indeed, the County was free to explore other options and the highest-ranking proposal was not entitled to be awarded the contract. (Winton-Spearman Dep. Doc. # 98 at 34:18-36:5). Here, as it had been discussing for years, the County was "considering whether to consolidate [the separate positions

of occupational health director and medical director], or not" and "wanted time to evaluate all possible options for providing the best quality at the best cost." (Thomas Aff. Doc. # 113 at ¶ 16; Freeman Aff. Doc. # 107 at ¶ 22).

But, King — having never been through the RFP process in her 15 years with the County — interpreted the selection committee's failure to immediately recommend her proposal to the Board differently. As she explained, King felt she "had decisively won" the RFP because hers was the highest ranking proposal and that the proposal should have been recommended to the Board then. (King Aff. Doc. # 116-4 at ¶ 67; King Dep. Doc. # 100 at 200:18-201:17). Adding to King's belief that denial of her proposal was inevitable, King learned that someone from the County had spoken to Dr. Aguilera about providing some services covered by the RFP and that worker's compensation services covered by the RFP had begun being provided by a different medical provider. (King Dep. Doc. # 100 at 188:19-190:6; King Aff. Doc. # 116-4 at ¶ 81).

King had been working under an extension of her contract throughout this process. The Board of County Commissioners had approved an official extension of King's contract through April 30, 2016. (King Dep. Doc. # 100 at 378). But, in a February 17, 2016 email to Mulloney, King acknowledged that

she had not signed the extension contract. (Id. at 202:1-9, 378-380). Instead, she informed Mulloney that she had forwarded the proposed extension contract to her attorney. (Id. at 379).

Then, on March 1, 2016, King emailed Mulloney stating that she was ending her contract with the County and her last day would be March 31, 2016. (Id. at 376). But King also stated she would be willing to continue her services under the outstanding RFP proposal. (Id.; King Aff. Doc. # 116-4 at ¶ 67). Rather than conduct and complete contract negotiations with King in the 30-day period before King stopped working, the County's Procurement Director, Fran McAskill, rejected both RFP proposals on March 24, 2016. (McAskill Dep. Doc. # 101 at 45:23-46:24; Doc. # 102 at 137-38; King Aff. Doc. # 116-4 at ¶ 69).

Freeman frames the rejection of the proposals as a response to King's termination of her contract:

> A decision was never made that the County would not enter into contract negotiations with Dr. King. We were looking at a new plan for occupational medicine and Dr. King was potentially a part of that. Then she abruptly terminated her contract, and we had to work quickly to explore all options.

(Freeman Aff. Doc. # 107 at ¶ 21). Thomas also emphasized that rejecting both proposals was necessary because the

County needed to find a replacement for King quickly, in light of King's resignation. (Thomas Aff. Doc. # 113 at ¶ 17; McAskill Dep. Doc. # 101 at 46:10-24, 120:9-22).

King maintains that, although the procurement director may reject a bid, McAskill did not have any authority to reject an RFP, as McAskill did. (King Aff. Doc. # 116-4 at ¶ 69). In contrast, McAskill asserts she had such authority under the County's procurement ordinance. (McAskill Dep. Doc. # 101 at 56:4-19, 67:6-11). King did not protest the RFP proceedings when she learned her proposal had not been recommended to the Board or when her proposal was ultimately rejected. (King Dep. Doc. # 100 at 198:3-5). King states she did not protest through the RFP's formal procedures because she believed she could not. The protest provision specified that protests could be submitted "with respect to the initial award of any bid or request for proposal, suspension or debarment," none of which specifically occurred. (Id. at 198:3-13; King Aff. Doc. # 116-4 at ¶ 69).

Nevertheless, after her RFP proposal was rejected, King met with various County Commissioners to discuss her concerns. According to King, one County Commissioner, Ed Smith, told her "that the RFP was put out because the County was embarrassed" about the "whole [Mr.] J situation." (King

Dep. Doc. # 100 at 159:25-160:21). This series of events instilled in King a "fervent belief that the County failed to renew [her] contract . . . in retaliation for raising both safety and reverse discrimination concerns regarding a medically unqualified firefighter trainee applicant." (King Aff. Doc. # 116-4 at ¶ 78). Additionally, King believes her "unwillingness to find [Mr. J] medically fit as an EMT without properly evaluating his pulmonary condition was deemed as recalcitrant and obstructive by County management." (Id. at ¶ 79).

Ultimately, in August of 2016, the County entered a "piggyback" agreement for another health provider to provide occupational health services through that provider's pre-existing contract with the County's School Board — a possibility that the County had previously been discussing. (Thomas Aff. Doc. # 113 at ¶ 18; Freeman Aff. Doc. # 107 at ¶ 22; McAskill Dep. Doc. # 101 at 11:7-12:9). "Piggybacking" a contract means adding additional services to "another entity's contract, as long as it was awarded by a governing body, a board or a commission or a council," without having to go through a separate competitive procurement process for the added services. (Winton-Spearman Dep. Doc. # 98 at 35:19-36:1). "Unlike under [] King's contract, the new

configuration allows for occupational health and medical services to be consolidated in the same provider." (Thomas Aff. Doc. # 113 at ¶ 18).

Subsequently, Mr. J re-enrolled in the firefighter academy as a regular trainee outside of the diversity program. (Mr. J Dep. Doc. # 92 at 7:17-8:6, 70:19-71:7). He was medically cleared and has been working as a firefighter in Polk County since November of 2016. (Id. at 7:17-8:6, 70:19-23, 72:10-18).

### C.    **Procedural History**

Plaintiffs initiated this action on September 15, 2016, asserting claims for First Amendment Retaliation and for violation of Florida's Whistleblower Act for public employees, Section 112.3187, Fla. Stat. (Doc. # 1). Defendants moved to dismiss the Amended Complaint (Doc. ## 34-37), and the Court granted the motions. The Court held that King's speech "regarding the breaches of procedure concerning" Mr. J's medical clearance was employee speech and could not support her First Amendment retaliation claims. (Doc. # 42 at 11).

After King filed her Second Amended Complaint (Doc. # 43), Defendants again moved to dismiss. (Doc. ## 48-51). The Court denied the motions and held that some of King's speech,

specifically her speech "regarding the possibility of reverse discrimination lawsuits and the falsification of records by Mr. J," plausibly was citizen speech on a matter of public concern. (Doc. # 58 at 14–16).

Defendants have now moved for summary judgment (Doc. ## 103-106), and the Motions are fully briefed. (Doc. ## 117-119, 122, 130-33).

## II.  Legal Standard

Summary Judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996)(citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir.

1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995)(quoting Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988)(citing Augusta Iron & Steel Works, Inc. v. Emp'rs Ins. of Wausau, 835 F.2d 855, 856 (11th

Cir. 1988)). However, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

## III. **Analysis**

### A.   **First Amendment Retaliation Claim**

In Counts III and IV of the Second Amended Complaint, King asserts First Amendment retaliation claims against the individual Defendants and the County. (Doc. # 43). Both of King's First Amendment claims are governed by a four-stage analysis to determine whether King's speech is protected. Moss v. City of Pembroke Pines, 782 F.3d 613, 617 (11th Cir. 2015)(citing Carter v. City of Melbourne, Fla., 731 F.3d 1161, 1168 (11th Cir. 2013)). The first step is for the Court to "consider whether [King's] speech was made as a citizen and whether it implicated 'a matter of public concern.'" Id. (quoting Rankin v. McPherson, 483 U.S. 378, 384 (1987)).

If this threshold requirement is met the Court will "then weigh [King's] First Amendment interests against the City's interest in regulating [her] speech to promote 'the efficiency of the public services it performs through its employees.'" Id. at 618 (quoting Rankin, 483 U.S. at 384);

see also Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cty., 391 U.S. 563 (1968). These first two questions are "questions of law that are decided by the Court." Moss, at 618 (citing Battle v. Bd. of Regents for Ga., 468 F.3d 755, 760 (11th Cir. 2006)).

"If [the employee's] speech is so protected, the third stage of the analysis requires Plaintiff to show that it was a substantial motivating factor in [her] termination." Id. at 618. If the employee does so, the burden shifts to the employer "to show by a preponderance of the evidence that it would have made the same decision even in the absence of the protected speech." Boyce v. Andrew, 510 F.3d 1333, 1343 (11th Cir. 2007).

Defendants argue King's speech was unprotected employee speech and that no adverse action causally-connected to that speech was taken against King. Even if an adverse action was taken, Defendants insist the same decision would have been made regardless of King's speech. In the event the Court finds that King was retaliated against because of protected speech, the individual Defendants contend they are entitled to qualified immunity. The Court will address each argument in turn.

1. **King's Speech is Not Protected by the First Amendment**

In its Order denying Defendants' Motions to Dismiss the Second Amended Complaint, the Court held that King's speech regarding the breaches of procedure concerning Mr. J's medical clearance (even if cast in the guise of "public safety concerns") was employee speech and could not support her First Amendment retaliation claims. (Doc. # 58 at 14). But the Court also held that King's speech "regarding the possibility of reverse discrimination lawsuits and the falsification of records by Mr. J" plausibly was citizen speech on a matter of public concern. (Id. at 14-16). Now, with the benefit of discovery, the Court will again address whether King's speech regarding potential reverse discrimination liability and the falsification of records is protected under the First Amendment.

First, Defendants argue that King's speech was, as a matter of law, not citizen speech on a matter of public concern. They argue King spoke as an employee because her statements were made pursuant to her role as occupational health director tasked with making recommendations on whether applicants are medically qualified. (Doc. # 105 at 5-7). Furthermore, Defendants argue that King did not speak on a

matter of public concern. According to Defendants, "the main thrust of [King's] voiced concern was a private grievance because she was trying to get [Mr.] J dismissed to purport with her own medical determination and frustration at what she perceived to be interference in her realm." (Doc. # 106 at 22).

The determination of whether an employee spoke as a citizen concerns whether the speech "owes its existence to a public employee's professional responsibilities." <u>Garcetti v. Ceballos</u>, 547 U.S. 410, 421-22 (2006). However, the phrase "owes its existence to . . . must be read narrowly to encompass speech that an employee made in accordance with or in furtherance of the ordinary responsibilities of her employment, not merely speech that concerns the ordinary responsibilities of her employment." <u>Alves v. Bd. of Regents of the Univ. Sys. of Ga.</u>, 804 F.3d 1149, 1162 (11th Cir. 2015). Thus, "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee — rather than citizen — speech." <u>Lane v. Franks</u>, 134 S. Ct. 2369, 2379 (2014).

Instead, the Court considers relevant practical factors including "the employee's job description, whether the speech occurred at the workplace, and whether the speech concerned

the subject matter of the employee's job." <u>Alves</u>, 804 F.3d at 1161. However, these factors are not dispositive. <u>Id.</u> An employee's job duties are interpreted practically because courts recognize that "[f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform." <u>Garcetti</u>, 547 U.S. at 424-25. And, as the Eleventh Circuit has explained,

> [W]e do not agree that speech regarding conduct that interferes with an employee's job responsibilities is not itself ordinarily within the scope of the employee's duties. Implicit in Appellants' duty to perform their roles as psychologists, committee members, supervisors, and coordinators is the duty to inform, as Appellants put it, "those that would appear to have the most need to know and best opportunity to investigate and correct" the barriers to Appellants' performance.

<u>Alves</u>, 804 F.3d at 1165.

Regarding the public concern prong, an employee's speech involves a matter of public concern if that speech can "be fairly considered as relating to any matter of political, social, or other concern to the community." <u>Cook v. Gwinnett Cty. Sch. Dist.</u>, 414 F.3d 1313, 1319 (11th Cir. 2005)(quoting <u>Connick v. Myers</u>, 461 U.S. 138, 146 (1983)). Still, "the relevant inquiry is not whether the public would be interested in the topic of the speech at issue but rather is 'whether the purpose of [the plaintiff's] speech was to raise issues

of public concern.'" <u>Maggio v. Sipple</u>, 211 F.3d 1346, 1353 (11th Cir. 2000)(quoting <u>Morgan v. Ford</u>, 6 F.3d 750, 754 (11th Cir. 1993)).

"In determining whether an employee's speech touched on a matter of public concern, [courts] look to the content, form, and context of a given statement, as revealed by the whole record," and determine "whether the 'main thrust' of the speech in question is essentially public in nature or private." <u>Mitchell v. Hillsborough Cty.</u>, 468 F.3d 1276, 1283 (11th Cir. 2006)(quotations omitted). "Although neither factor is dispositive, [courts] look to: (1) 'whether the speech was communicated to the public at large or privately to an individual;' and (2) 'what the speaker's motivation in speaking was.'" <u>Wilbourne v. Forsyth Cty. Sch. Dist.</u>, 306 F. App'x 473, 477 (11th Cir. 2009)(quoting <u>Mitchell</u>, at 1283–84).

"Although 'content' is the most important factor in assessing whether a particular type of speech is a matter of public concern, when context and motivation indicate that speech is private, speech that otherwise would be considered 'a matter of public concern' can be deemed private." <u>Wilbourne</u>, 306 F. App'x at 477 (quoting <u>Mitchell</u>, at 1284). Indeed, "[w]hen there is a personal element to the speech,

complaints of wrongdoing within a public agency may not constitute speech on a matter of public concern." <u>Stanley v. City of Dalton, Ga.</u>, 219 F.3d 1280, 1289 n.13 (11th Cir. 2000).

Here, as for King's discussion of possible reverse discrimination lawsuits and Mr. J's alleged falsification of medical records, the Court determines King did not speak as a citizen on a matter of public concern. King does not allege that she contacted the media, or spoke out about the falsification of records or possible reverse discrimination at a city council meeting, or made her concerns public in any other way. <u>Cf.</u> <u>Boyce</u>, 510 F.3d at 1344-46 (finding caseworkers spoke as employees and noting that one employee's "complaints, although more often in a written format as a letter or memorandum to a supervisor, were not sent to an outside entity"). Although this fact is not dispositive, it supports that King was speaking as an employee, rather than a citizen.

King spoke privately to Thomas and Freeman, within the County's management. In her conversations with them, King expressed her belief that Mr. J had provided inaccurate medical history information to Employee Health Services and outside medical providers. King reached this conclusion after

she was asked to review Mr. J's medical records and note any inconsistencies by her point of contact at the County, Kushner. Although King had never been asked to review medical questionnaires for inconsistencies before, King was asked to give her "medical opinion" as to the accuracy of Mr. J's questionnaires in the same email in which she was asked to "render an opinion on whether or not he may perform the duties of a firefighter." (King Dep. Doc. # 100 at 310).

Thus, King was asked to review the accuracy of the medical records in her capacity as occupational health director. See Berry v. Coleman, 172 F. App'x 929, 932 (11th Cir. 2006)("[I]n this case Berry prepared the memorandum in response to an order from his employer and not on his own initiative. Although the subject of the memorandum is something in which the public might have an interest, Berry spoke through it solely in his position as an employee."); see also Phillips v. City of Dawsonville, 499 F.3d 1239, 1242–43 (11th Cir. 2007)(finding that, although the plaintiff city clerk's reporting of misconduct that might result in litigation expenses and liability for the city was not part of her "enumerated duties," plaintiff spoke "pursuant to [her] official duties").

Additionally, in her deposition, King agreed that she needed to have "a comfort level" with the accuracy of an applicant's medical history to make her fitness for duty determinations and that an inaccurate history is "certainly something [she] take[s] into consideration." (King Dep. Doc. # 100 at 129:24-130:9). And, in her June of 2015 letter, King discussed her "concerns regarding [Mr. J's] credibility as a patient and ability to provide a truthful account of his current medical condition and symptoms" as part of the reason why she would not medically clear Mr. J unless he took an additional test. (Id. at 324). Thus, Mr. J's medical history was a consideration in King's performance of her job duties as occupational health director. Even though King continued to speak about the perceived falsification of Mr. J's medical records after the decision was made to hire him as an EMT, King's speech was made in accordance with her ordinary duties of making fitness for duty determinations.

As for the public concern prong, the inconsistencies in Mr. J's medical questionnaires served to bolster King's pre-existing argument made in her capacity as occupational health director — that Mr. J should be dismissed. True, speech regarding public safety or misconduct by government employees often involves a matter of public concern. See Cook v.

Gwinnett Cty. Sch. Dist., 414 F.3d 1313, 1319 (11th Cir. 2005)("In various contexts, we have made it clear that speech relating to the safety of the public involves a matter of public concern."); see also Garcetti, 547 U.S. at 425 ("Exposing governmental inefficiency and misconduct is a matter of considerable significance."). But, despite reference to safety issues or misconduct, King was motivated by her frustration in her job. See Myles v. Richmond Cty. Bd. of Educ., 267 F. App'x 898, 900 (11th Cir. 2008)("Though her speech did touch on a matter of public interest, the true purpose behind Appellant's various complaints was not to raise an issue of public concern, but rather to further her own private interest in improving her employment position.").

In her affidavit, King wrote that, whenever she had disagreed with an applicant's personal physician and disqualified him in the past, "the County did not hire that individual for that position." (King Aff. Doc. # 116-4 at ¶ 30). According to King, "[i]n fifteen years, the County never challenged [her] decision or overruled [her] decision." (Id.). Defendants did not show the same deference to King in Mr. J's case, much to King's chagrin. In context, the main thrust of King's comments was that other provider's clearances for Mr. J should be ignored, not only because King

disagreed medically, but also because Mr. J provided them inaccurate medical histories. See Brooks v. Univ. of Wisconsin Bd. of Regents, 406 F.3d 476, 480 (7th Cir. 2005)(holding that plaintiff employees' expression of ethical concerns with the operation of clinics did not address a matter of public concern because "the plaintiffs' objections did not so much center on patient welfare as on the internal operations of the clinics, more specifically, [one plaintiff's] ability to operate as he saw fit and the plaintiffs' roles within the clinics").

Furthermore, King's speech regarding reverse discrimination was not on a matter of public concern. Again, King did not address her concerns to the public — only within the County management. And, within her conversations with Thomas and Freeman, the reverse discrimination liability concern was not the main focus of King's complaints. King's personal notes taken after her meetings with Thomas and Freeman do not mention possible discrimination lawsuits by medically disqualified white applicants. (King. Dep. Doc. # 100 at 151:6-16, 338-41). Rather, during these meetings, King discussed the safety concern she felt was created by not heeding her professional advice and allowing someone she had not medically qualified to work as an EMT or firefighter.

King emphasized HR's "unprecedented involvement," including Baker-Buford's advising King to treat Mr. J fairly and her advocating for acceptance of Mr. J's outside medical clearances without requiring clearance from King. (Id. at 141:23-143:12, 149:22-150:1). King considered Baker-Buford's involvement to be "gross interference with [King's] job responsibilities." (King Aff. Doc. # 116-4 at ¶ 38). And, "shocked" that Baker-Buford had implied King was treating Mr. J unfairly, King retorted that Baker-Buford's treatment of Mr. J was "favoritism" and discriminatory against white would-be firefighters. (Id. at ¶¶ 38, 40)

In context, King's speech about potential reverse discrimination liability involved King airing personal dissatisfaction and enumerating another consequence of failing to follow "normal" procedures – i.e. the County choosing not to adopt King's recommendation as to Mr. J's fitness, as it usually did. (Doc. # 106 at 20); see also Morgan v. Ford, 6 F.3d 750, 755 (11th Cir. 1993)(internal citation omitted)("Considering the entire record, we conclude that Morgan primarily spoke [about sexual harassment of herself and a co-worker] as an employee in order to improve her work environment. While she did speak about her co-worker's plight, which contains a public concern aspect, the

main thrust of her speech took the form of a private employee grievance."). This is a personal grievance. See Myles, 267 F. App'x at 900 (noting that while plaintiff's complaint that unqualified people were being appointed to positions in the school district touched on an important matter of public interest, plaintiff "voiced her concerns as a disgruntled employee rather than as a citizen concerned about corruption").

Therefore, King's speech is not protected by the First Amendment. The Court need not determine under the Pickering balancing test whether Defendants' interests in efficient operation of the County outweighed King's interest in her speech.

### 2. The RFP's Initiation and Rejection of Proposals are not Causally Connected to King's Speech

Even if King's speech were protected, Defendants argue that King cannot show that any adverse action was taken against her because of that speech. In contrast, King insists that an adverse action was taken because of her speech when the County "notified [King] that it would not renew her contract, and intended to submit her contract for RFP." (Doc. # 122 at 10). Additionally, King implies that the failure to

award her a new contract under the RFP was another adverse action. (Id.; Doc. # 117 at 17).

"In order to establish a causal connection, the plaintiff must show that the defendant was subjectively motivated to take the adverse action because of the protected speech." Castle v. Appalachian Tech. Coll., 631 F.3d 1194, 1197 (11th Cir. 2011). "However, once the plaintiff shows that her protected conduct was a motivating factor, the burden shifts to the defendant to show that she would have taken the same action in the absence of the protected conduct, in which case the defendant cannot be held liable." Id. "In other words, the defendants may show that retaliation was not the but-for cause for the firing." VanDeWalle v. Leon Cty. Florida, 661 F. App'x 581, 585 (11th Cir. 2016)(quoting Massey v. Johnson, 457 F.3d 711, 717 (7th Cir. 2006)). "The plaintiff then may show that the defendants' proffered reasons are pretextual and that retaliatory animus was the real reason for the adverse action." VanDeWalle, 661 F. App'x at 585. "At bottom, the employee must prove an improper employer motive." Id. (citation and internal quotation marks omitted).

King has not shown a genuine issue of material fact as to whether her speech caused any adverse action. Defendants insist the reason the contract was sent to RFP was a County

ordinance that Defendants believed required an RFP for King's position. (Doc. # 103 at 23; Doc. # 106 at 25-26). According to Defendants, they would have put the contract through RFP regardless of King's speech. (Id.). Here, Defendants decided to put all medical service provider contracts through the RFP process, including King's contract, because of the County ordinance in 2013 — long before King's speech at issue. (Craig Aff. Doc. # 112 at ¶¶ 4-5).

King maintains that the County ordinance in question did not apply to her contract for various reasons. (Doc. # 117 at 17). This argument misses the mark. What matters is whether Defendants believed the County ordinance required the RFP, as Defendants have shown. See Heffernan v. City of Paterson, N.J., 136 S. Ct. 1412, 1418 (2016)("In a word, it [is] the employer's motive, and in particular the facts as the employer reasonably understood them, that matter[s] [for First Amendment retaliation claims]."); see also Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1187 (11th Cir. 1984)(noting, in the Title VII context, that an "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason"). Although King stresses the proximity between her speech and the RFP's

initiation, that does not show causation because the RFP was contemplated since 2013. See Drago v. Jenne, 453 F.3d 1301, 1308 (11th Cir. 2006)("[I]n a retaliation case, when an employer contemplates an adverse employment action before an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation.").

Additionally, King asserts that, after the RFP proposals had been cancelled, County Commissioner Smith told her "that the RFP was put out because the County was embarrassed" about the "whole [Mr.] J situation." (King Dep. Doc. # 100 at 159:25-160:21). But the opinion of a County Commissioner uninvolved in the RFP process does not undermine the record evidence showing that the decision was made in 2013 and does not create a genuine issue of material fact. Even if King had shown a prima facie case that her speech was a motivating factor in the RFP being initiated, Defendants have shown that they would have taken the same action regardless of King's speech in order to comply with the County Attorney's advice about complying with the ordinance.

As for the subsequent rejection of King's RFP proposal, even assuming King established a causal connection between her speech and the rejection, Defendants have shown by a

preponderance of the evidence that the same decision would have been made. Defendants contend that, regardless of King's speech, the County would have rejected the RFP proposals after King's resignation under her current contract. (Doc. # 103 at 24). Although the selection committee did not recommend King's RFP proposal to the Board, it was Procurement Director McAskill's rejecting both RFP proposals and ending the RFP process entirely that prevented King from being awarded a new contract. And, Freeman, Thomas, and McAskill all described the rejection of the RFP proposals on March 24, 2016, as a reaction to King's terminating her current contract, effective March 31, 2016. (Freeman Aff. Doc. # 107 at ¶ 21; Thomas Aff. Doc. # 113 at ¶ 17; McAskill Dep. Doc. # 101 at 46:10-24, 120:9-22).

King's arguments are insufficient to show pretext. King points out that Thomas had Kushner ask USF to participate in the RFP process and other County employees spoke to other vendors while the RFP was underway. (Doc. # 117 at 19). But evidence shows that the County was considering consolidating various medical services provided by different providers, including King and USF, and had been considering consolidation for years. (Kushner Dep. Doc. # 89 at 67:12-21; Thomas Aff. Doc. # 113 at ¶ 16; Freeman Aff. Doc. # 107

at ¶ 22). Thomas also asked whether King would change how she handled Mr. J's situation if she could during the selection committee interview. That comment does not rebut the evidence that the rejection of both RFP proposals, including King's, was motivated by King's resignation.

Even if the decision to reject King's proposal was not made because of her resignation, there is no evidence that the decision was based on King's speech, rather than King's handling of Mr. J's situation in her capacity as occupational health director. Thomas's question during the selection committee meeting — if it shows any disapproval of King at all — shows disapproval of how King chose to medically disqualify Mr. J despite Defendants' placing him as an EMT. Indeed, in her affidavit, King states that her "unwillingness to find [Mr. J] medically fit as an EMT without properly evaluating his pulmonary condition was deemed as recalcitrant and obstructive by County management." (King Aff. Doc. # 116-4 at ¶ 79).

But if the County were frustrated at King's recommendation that Mr. J was not medically qualified, that would be frustration over how King performed her job — not over King's speech about potential reverse discrimination liability or falsification of records. Defendants were free

to take action against King if they disapproved of the medical recommendation she made, or refused to make, as occupational health director. See Garcetti, 547 U.S. at 424 ("[T]he First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities."). King has not presented sufficient evidence to suggest that her speech about Mr. J's alleged falsification of records or potential reverse discrimination lawsuits was the true reason why the RFP was initiated or why she was not awarded a contract under the RFP.

### 3. The Individual Defendants are Entitled to Qualified Immunity

Alternatively, Freeman, Thomas, and Baker-Buford are each entitled to qualified immunity because King has not shown that the law regarding the alleged constitutional violation was clearly established. Qualified immunity protects government officials performing discretionary functions from being sued in their individual capacities unless their conduct violates a clearly established statutory or constitutional right. Brannon v. Finkelstein, 754 F.3d 1269, 1278 (11th Cir. 2014).

In order to establish a defense of qualified immunity, a government official must first demonstrate that he or she

was acting within his or her discretionary authority. <u>See</u> <u>Dalrymple v. Reno</u>, 334 F.3d 991, 995 (11th Cir. 2003). King does not challenge that the individual Defendants were acting in their discretionary authority. Assuming some of King's speech was protected under the First Amendment, the Court's qualified immunity analysis focuses on whether King's right was clearly established.

To determine if a right is clearly established, courts in the Eleventh Circuit use "three methods to show that the government official had fair warning" <u>Gaines v. Wardynski</u>, 871 F.3d 1203, 1208 (11th Cir. 2017).

> First, the plaintiffs may show that a materially similar case has already been decided. Second, the plaintiffs can point to a broader, clearly established principle that should control the novel facts of the situation. Finally, the conduct involved in the case may so obviously violate the constitution that prior case law is unnecessary.

<u>Id.</u> "The second and third methods are generally known as 'obvious clarity' cases." <u>Id.</u> at 1209.

King argues the obvious clarity method is the appropriate one for the Court's analysis. (Doc. # 117 at 22-23). The Court disagrees. The first method is the relevant one for this analysis because "it is not 'so obvious' that [Defendants] violated the First Amendment in light of the close merits question of whether" King spoke as an employee

or as a citizen. <u>Carollo v. Boria</u>, 833 F.3d 1322, 1333 (11th Cir. 2016)

Furthermore, under the first method, the Court agrees with Defendants that this case does not present the unusual circumstance in which the employee's right to speak was so clearly established as to defeat qualified immunity. "[T]o establish fair warning under this method, plaintiff may point to prior case law (from the Supreme Court of the United States, the Eleventh Circuit, or the highest court in the relevant state) that is 'materially similar.'" <u>Gaines v. Wardynski</u>, 871 F.3d 1203, 1209 (11th Cir. 2017)(citation omitted). Under this method, the "existing case law does not necessarily have to be 'directly on point,'" but "it must be close enough to have put 'the statutory or constitutional question beyond debate.'" <u>Id.</u> at 1209–10 (citation omitted). "If reasonable people can differ on the lawfulness of a government official's actions despite existing case law, he did not have fair warning and is entitled to qualified immunity." <u>Id.</u> at 1210.

Here, existing case law did not give the individual Defendants fair warning that their actions violated King's First Amendment rights. Case law provides that "[t]he law is clearly established that an employer may not demote or

discharge a public employee for engaging in protected speech." Travers v. Jones, 323 F.3d 1294, 1295 (11th Cir. 2003). But the Supreme Court recently reiterated that "clearly established law should not be defined at a high level of generality." White v. Pauly, 137 S. Ct. 548, 552 (2017)(citation and quotation marks omitted). "[G]eneral statements of the law are not inherently incapable of giving fair and clear warning . . . but in the light of pre-existing law the unlawfulness must be apparent." Id. (citations and quotation marks omitted).

The Eleventh Circuit has reaffirmed that "[i]t is particularly difficult to overcome the qualified immunity defense in the First Amendment context." Gaines, 871 F.3d at 1210; see also Maggio v. Sipple, 211 F.3d 1346, 1354 (11th Cir. 2000)("[A] defendant in a First Amendment suit will only rarely be on notice that his actions are unlawful" (citation omitted)). This is because the law must be clearly established as to both prongs of the Pickering test, meaning that it must be clearly established that King spoke as a citizen on a matter of public concern and that her interest in her speech outweighed Defendants' interests. See Maggio, 211 F.3d 1346, 1355 (11th Cir. 2000)("[T]he allegations of Maggio's complaint do not so clearly establish that her testimony at

Davis's grievance hearings satisfied both prongs of the Pickering-Connick test that no reasonable person could believe that both prongs of the test had not been met." (citation and quotation marks omitted)).

None of the cases cited by King clearly established that her speech was protected as citizen speech on a matter of public concern. See Cook, 414 F.3d at 1319-20 (holding that school bus driver, who was also president "of an organization that, inter alia, seeks to improve the safety of children in school," spoke on a matter of public concern and the Pickering balancing tilted in her favor when she "expressed her concerns about the safety of children due to bus overcrowding"); Fikes v. City of Daphne, 79 F.3d 1079, 1084 (11th Cir. 1996)(reversing grant of qualified immunity at motion to dismiss stage where police officer alleged "he was fired because he reported police misconduct" in the form of a "failure to terminate a dangerous, high-speed chase, and improper use of a confiscated vehicle"); Finch v. City of Vernon, 877 F.2d 1497, 1501-02 (11th Cir. 1989)(reversing grant of judgment notwithstanding the verdict where Finch made public statements "[w]arning that closing a public road would create a safety hazard").

None of these cases deal with alerting an employer to potential liability based on an intended hiring decision of the employer's. Nor do they deal with an employee — let alone an employee whose job responsibilities include reviewing records — alleging the falsification of records. Although the cases deal with potential threats to public safety, King's complaints that Mr. J answered his medical questionnaires inconsistently is far weaker a supposed public safety threat than those in the described cases. These cases would not give Defendants fair warning that any actions they took against King were a violation of King's First Amendment rights.

Furthermore, it is not clear from these cases that King's interest in her speech would outweigh the County's interest in efficient operation. After determining if an employee spoke as a citizen on a matter of public concern, the next step of the First Amendment analysis is the Pickering balancing test. See Pickering, 391 U.S. at 568. "The Pickering test seeks to arrive at a balance between the employee's interest in commenting on matters of public concern and his employer's interest in efficiently providing public services." Moss, 782 F.3d at 621 (citing Leslie v. Hancock Cty. Bd. of Educ., 720 F.3d 1338, 1346 (11th Cir. 2013)). "In striking this balance, we consider '(1) whether the speech at

issue impedes the government's ability to perform its duties efficiently, (2) the manner, time and place of the speech, and (3) the context within which the speech was made.'" Snipes v. Volusia Cty., No. 16-14221, 2017 WL 3588273, at *3 (11th Cir. Aug. 21, 2017)(quoting Morales v. Stierheim, 848 F.2d 1145, 1149 (11th Cir. 1988)).

The Court agrees that it would not be clear to Defendants that the Pickering balancing test weighed against them. See Dartland v. Metro. Dade Cty., 866 F.2d 1321, 1323 (11th Cir. 1989)("Because no bright-line standard puts the reasonable public employer on notice of a constitutional violation, the employer is entitled to immunity except in the extraordinary case where Pickering balancing would lead to the inevitable conclusion that the discharge of the employee was unlawful.").

Assuming King spoke as a citizen on a matter of public concern, King had a sizeable interest in her speech. See Bryson v. Waycross, 888 F.2d 1562, 1566 (11th Cir. 1989)("[A] core concern of the [F]irst [A]mendment is the protection of the 'whistle-blower' attempting to expose government corruption."). But, according to Defendants, the County also has "a strong interest in the PDRTP [diversity program], hiring diverse candidates, having an occupational director

who was on-board with federal anti-discrimination laws, and working with employees who had the potential to serve the County and overcome temporary physical set-backs." (Doc. # 103 at 22).

Defendants assert that King's speech interfered with the County's efficient operation:

> in voicing her opinion that [Mr.] J remained employed with Polk County because of reverse discrimination and thus refusing to work with the County in reasonably accommodating him, [ ] King's speech interfered with the County's interest in promoting the PDRTP [diversity program] and complying with all federal and state anti-discrimination laws.

(Doc. # 106 at 23). Defendants presented evidence that Freeman was frustrated because he interpreted King's speech as advocating for Mr. J's dismissal, without making constructive recommendations for possible reasonable accommodations. (Freeman Dep. Doc. # 85 at 94:7-10, 98:18-99:4). King herself stated that her refusal to medically qualify Mr. J "was deemed as recalcitrant and obstructive by County management." (King Aff. Doc. # 116-4 at ¶ 79). In light of the competing interests, it was not clear that the balancing test weighed in favor of King. Therefore, Defendants did not have fair notice that their actions violated King's First Amendment rights.

Finally, as to causation, "the defendant is entitled to qualified immunity '[w]here the facts assumed for summary judgment purposes . . . show mixed motives (lawful and unlawful motivations) and pre-existing law does not dictate that the merits of the case must be decided in plaintiff's favor.'" Brannon, 754 F.3d at 1278–79 (quoting Foy v. Holston, 94 F.3d 1528, 1535 (11th Cir. 1996)). Here, even if Defendants were motivated by King's protected speech, the evidence shows they also had lawful motives and the merits of the case need not be decided in King's favor. The County Attorney had advised in 2013 that the County needed to put all medical director contracts through the RFP process. Additionally, Defendants were motivated, at least in part, to reject King's RFP proposal by King's resignation under her previous contract.

Freeman, Thomas, and Baker-Buford are accordingly entitled to qualified immunity.

## B. **Florida Public Whistleblower Claim**

King's First Amendment retaliation claims provided the sole source of federal jurisdiction in this case, as the parties do not meet the requirements of diversity jurisdiction pursuant to 28 U.S.C. § 1332. Rather, the Court concludes that supplemental jurisdiction pursuant to 28

U.S.C. § 1367 supplies the only remaining basis for jurisdiction over the Florida Public Whistleblower Act claims.

"The dismissal of [a plaintiff's] underlying federal question claim does not deprive the [c]ourt of supplemental jurisdiction over the remaining state law claims." Baggett v. First Nat. Bank of Gainesville, 117 F.3d 1342, 1352 (11th Cir. 1997). "Indeed, under 28 U.S.C. § 1367(c), the Court has the discretion to decline to exercise supplemental jurisdiction over non-diverse state law claims, where the [c]ourt has dismissed all claims over which it had original jurisdiction, but [the court] is not required to dismiss the case." Id. Nevertheless, the Eleventh Circuit has "encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial." Raney v. Allstate Ins. Co., 370 F.3d 1086, 1089 (11th Cir. 2004).

Plaintiffs' whistleblower claims depend on determinations of state law. "[S]tate courts, not federal courts, should be the final arbiters of state law." Ingram v. School Bd. of Miami–Dade County, 167 F. App'x 107, 108 (11th Cir. 2006). Furthermore, the Court finds that principles of judicial economy and comity weigh in favor of the Court

declining to exercise supplemental jurisdiction over Plaintiffs' remaining claims.

Accordingly, because the Court grants Defendants' Motions for Summary Judgment with regard to King's federal claims, and diversity jurisdiction does not exist, the Court in its discretion declines to exercise supplemental jurisdiction over Plaintiffs' whistleblower claims. See Nagy v. Taylor Cty. Sch. Dist., No. 5:16-CV-70-MTT, 2017 WL 4448579, at *14 (M.D. Ga. Oct. 5, 2017)("[B]ecause Defendants are entitled to judgment as a matter of law on the federal law claims, the Court declines to exercise supplemental jurisdiction over the state law tort claims."). The Florida whistleblower claims, Counts I and II, are dismissed without prejudice. Pursuant to 28 U.S.C. § 1367(d), the statute of limitations is tolled "for a period of 30 days after it is dismissed unless State law provides for a longer tolling period."

## IV. Conclusion

King's First Amendment retaliation claims, Counts III and IV, fail and summary judgment is granted for Defendants on those claims. With the federal claims disposed of before trial, the state law claims, Counts I and II, are dismissed

without prejudice so that Plaintiffs may reassert them in state court, if they wish.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

(1) Defendants' Motions for Summary Judgment (Doc. ## 103-106) are **GRANTED** to the extent judgment shall be granted in Defendants favor for the First Amendment retaliation claims, Counts III and IV.

(2) The Florida Public Whistleblower Act claims, Counts I and II, are **DISMISSED WITHOUT PREJUDICE** so that they may be reasserted in state court.

(3) The Clerk is directed to enter judgment in favor of Defendants and against Plaintiff Nancy King for Counts III and IV. Thereafter, the Clerk is directed to **CLOSE** the case.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 6th day of December, 2017.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE